**LEWIS v. UNITED STATES.**

No. 10522.

United States Court of Appeals
Third Circuit.

Argued Dec. 20, 1951.

Decided Feb. 12, 1952.

Thorn Lord, Trenton, N. J., for appellant.

Edward V. Ryan, Asst. U. S. Atty., Jersey City, N. J. (Grover C. Richman, Jr., U. S. Atty. for District of New Jersey, Newark, N. J., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant sued below under the Federal Tort Claims Act, 62 Stat. 982, 28 U.S.C. § 2671 et seq., alleging personal injuries caused by the negligence of a Government employee acting within the scope of his employment and in the line of duty. The case was tried to the Court as the statute provides, 28 U.S.C. § 2402 and resulted in a judgment against plaintiff from which he now appeals.

The incident forming the basis of the action occurred on April 30, 1948 about 5:00 P.M. on the Bayonne, New Jersey, Naval Supply Depot in the vicinity of its 32nd Street gate. Prior to an outside civilian being allowed on the base he had to identify himself. He then received a clearance button which he surrendered on leaving.

The appellant Lewis, in the business of buying and selling second-hand machinery, had purchased some surplus Navy machinery which was still on the base. Among that machinery was a crane which Lewis wished to crate and ship away. About 8:30 on the morning of April 30, 1948, Lewis came to the base in his automobile to take care of this. He was accompanied by two employees, Ferdinand and William Unger, father and son. After parking his car outside the 32nd Street gate he and the Ungers went to the guard-house by the gate. They registered, were given identification buttons and went on into the base to the crane's location. Later that morning another Lewis employee, Kinney by name, drove on the base in his automobile to

which a trailer was attached. In the trailer were tools belonging to Lewis. Kinney with his automobile and trailer joined Lewis at the crane. About quarter of five that afternoon Lewis and his men finished working for the day and they all rode back to the gate in Kinney's car. The Lewis tools were in the attached trailer with the exception of some sort of an acetylene torch which was in the rear of the car. Lewis testified that there had been thefts from the base; in particular, "some thousands of dollars worth of stuff" had been stolen from the base, and "every car leaving the post between 4:30 and 5:30 were searched."

The Lewis car was stopped at the gate by a Marine sentry because there was no property pass covering the tools. Lewis was advised that such a pass was necessary and Sergeant Daniels of the Marine guard escorted him to the civilian guard office in a building adjoining the gate in order that this might be attended to. There, according to Stewart, the civilian guard on duty, Lewis started swearing. "God-damn it," he said, "I have been buying material from the Government, $80,000 worth, and I want to get processed much quicker than this." Later, Stewart testified, Lewis cursed at him and said, " * * * I will get you outside the reservation." Stewart immediately called the Provost Marshal's office and talked with Mrs. Tiene, secretary to the Provost Marshal and a security office employee, about the property pass. He said that as he was talking Lewis " * * * grabbed the 'phone and * * * started swearing." Mrs. Tiene testified that she heard the swearing over the telephone.

Acting on Mrs. Tiene's instructions Lewis in Kinney's car with Kinney driving, went to the proper base office to secure the property pass. Before doing so he sent the Ungers out to his own car to there await his return. He obtained the pass and he and Kinney came back to the 32nd Street gate where he gave the pass to Marine Corporal Zrubek, who was in charge. The corporal, inspecting the pass, found that it had been written in lead pencil, contrary to regulations. He ordered Kinney to pull his car out of traffic while the pass was checked. Zrubek testified that as the ci-

vilian guard Stewart was telephoning about the pass Lewis alighted from the car and stood on the side of his sentry box and said, "These 'God-damn punks' and things like that. I cannot tell you the words. He called me a 'snot-nosed punk' and 'a snot-nosed beak'". Zrubek states that he did not argue with Lewis and simply told him that it was a matter for his commanding officer. The pass was cleared shortly by telephone and Zrubek went outside and so advised Lewis. He said that as Lewis " * * * goes to get in [the Kinney automobile] he called me a 'snot-nosed bastard'". Zrubek walked to the front of the car. He states the machine jerked forward. He instructed Private Foote, a Marine on sentry duty at the gate " * * * to hold the vehicle" while he telephoned the sergeant of the guard " * * * because we didn't like that sort of thing going on at the gate not only with me but anybody else." The sergeant ordered him to get the civilian police and have Lewis put under arrest. Zrubek had started over toward Stewart's office for that purpose when he heard some shots.

Private Foote testified that he knew little or nothing of the situation prior to Corporal Zrubek ordering him to hold the car. After receiving the order he states that he went to the left side of the car and instructed Kinney not to move it and Kinney had said, "All right." Lewis ordered Kinney to drive on, but Kinney refused. Then Lewis said to Kinney, "Get out I will drive." Kinney replied, "All right. You drive. He's got a gun." Lewis admitted that Kinney said to him, "He wasn't going to drive, he [Foote] had a gun." Kinney alighted from the car, Lewis moved in behind the wheel and started driving the car forward. As he did Foote told him that he could not move the automobile. Foote testified that Lewis said, "I will drive this God-damned car" or something to that effect and started off. Foote yelled "Halt" three times. He meanwhile, drew, loaded and cocked his pistol. Seeing that the car was not going to stop he fired two warning shots into the air. The car continued on and Foote fired two shots at the car's left rear tire. One of the shots hit the left rear fender, the other went through the left

rear glass and struck Lewis in the left shoulder as he was sitting in the driver's seat on the left side of the automobile. Lewis estimated that the distance from where he had last stopped which was where Foote was standing to where he was hit was about 170 feet. Foote guessed the distance as perhaps 150 feet. Asked about his orders with reference to restraining a person from getting away he said, "My orders were to hold the car, and I couldn't hold it by myself. The only thing I could do, that is what weapons were there for, to use."

Marine Captain McLeod, who was in charge of the Marine guards at the Bayonne Naval Supply Depot at the time of trial, testified concerning basic orders for sentinels in force on April 30, 1948 and applicable to Private Foote at that time. He said that under the first general order the sentinel " * * * carries out and uses all means at his disposal to arrest the person or any party causing a disorder on his post." He further said that "These orders, all sentinels standing a post are required to memorize prior to being posted."

Lewis was taken to the Bayonne Hospital where the bullet was removed by Dr. Chayes. The latter was not a witness. The Government agreed to allow a report by him to be read into evidence upon the understanding that if the doctor were a witness he would testify substantially the same as what was contained in the report. The report said that the bullet had fractured the left shoulder. Lewis stated that he was in the hospital for two weeks or a few days over two weeks. The doctor's report said that the doctor discharged Lewis on November 29, 1948, with some permanent disability of the left shoulder.

The Trial Judge found as facts that Lewis did use profanity and was abusive on one or more occasions and did engage in one or more altercations with the Marine and civilian police personnel of the base and that as a result Private Foote was ordered by his superior to hold the Lewis car until permission to arrest Lewis was obtained. The events thereafter were found to have happened as already outlined above.

There was a finding that civilian patrolman Stewart, Corporal Zrubek and Private Foote acted " * * * within the scope of their proper functions and duties in all of their actions in connection with the plaintiff and the stopping of the car in which he was a passenger, * * *" and that they only did " * * * what they considered necessary and appropriate in the proper execution of their duties and orders, * * *" except that Foote in firing his pistol, as he did, was found to have " * * * used excessive force under all the circumstances surrounding the occurrence."

By the final finding of fact Lewis was held to have been negligent " * * * when, in spite of instructions from the sentry to stop the car, he wilfully drove it away from the gate."

As a conclusion of law it was held that the shooting was an assault and battery upon Lewis and consequently non-recoverable under sub-division (h) of the Exceptions to the Tort Claims Act, 28 U.S.C. § 2680(h). Contingently it was concluded as a matter of law that if Foote's action did not constitute assault and battery but under the circumstances was to be construed as an act of negligence so as to bring it within the Tort Claims Act, then Lewis' failure to stop on Foote's order was contributory negligence so as to defeat his action under the law of New Jersey which was held applicable to the case.[1]

---

1. See 28 U.S.C. § 1346(b); Feres v. United States, 340 U.S. 135, 142, 71 S.Ct. 153, 95 L.Ed. 152. The Tort Claims Procedure Act itself, Section 2672, expressly provides that the Government's liability for the act or omission of one of its employees while acting within the scope of his office or employment depends on whether it took place " * * * under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." That section of the Act deals particularly with administrative adjustment of claims of $1,000 or less but that the law of the place rule applies generally to the Act is made clear by Section 2674 which states that "The United States shall be liable, * * * in the same

Appellant's first point is that the shooting was not an assault and battery within the exceptions to the Tort Claims Act.

Section 2674 of the Act which states the liability of the United States reads: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages. * * *"

Under Section 2680 the provisions of the Act shall not apply to "(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

The Court found, and it has compelling support in the record, that the sentry Foote directed Lewis and Kinney to wait. In spite of Foote's warning Lewis instructed Kinney to drive on. Kinney refused, saying to Lewis that Foote had a gun. Lewis ordered Kinney out of the car and Kinney obeyed. Lewis moved into the driver's seat and started to drive away from the gate. Then, as found in finding #9, "Private Foote ran alongside the car and again instructed the plaintiff Lewis to stop the car, but Lewis continued to drive away from the gate." Foote shouted three times at Lewis to halt. Lewis continued on and Foote fired two warning shots in the air. Lewis did not stop and Foote fired twice at the car's left rear tire which, according to the Court's finding of fact, was approximately fifty yards away from him. One shot hit the left rear fender. The second also struck on the left side of the car going through the left side of the rear window. This would seem rather good marksmanship with a .45 caliber automatic pistol at 150 feet and a receding target. Even so and though Private Foote had no intention of hitting Lewis it can be assumed that in the circumstances he realized that firing at the machine's left rear tire while Lewis was in the left front seat could readily produce that result or at least that it was well within the possibilities of such act. And while Foote had no wish to shoot Lewis his entire purpose in firing at the automobile was to cause apprehension of harm in Lewis so that he would stop his automobile. Lewis, from his own testimony, was on reasonable notice that if he insisted on driving away in violation of the sentry's order to him, he might be shot at. The Marine guard had been alongside of him. He denies that the guard told Kinney and himself not to leave but he does state that Kinney, who had been driving and who was still in the driver's seat, said to him, "I won't drive away because the man has a gun." It was at that time that Lewis ordered Kinney out of the latter's own car and took over the driving himself. And it was the shooting of Lewis soon afterwards that the Trial Court found to be excessive force under the particular circumstances and therefore an assault by Foote upon Lewis.

While no New Jersey decision has been seen which is on all fours with the present facts, the opinion in Williams v. Lubbering, 73 N.J.L. 317, 319, 63 A. 90, 91, an action for assault and battery, does clearly indicate that New Jersey follows the general legal principle involved; namely, that a person privileged to use adequate physical

manner and to the same extent as a private individual under like circumstances, * * *." With the occurrence happening in New Jersey the private individual's conduct in "like circumstances" would of course be judged by New Jersey law. The second paragraph of 2674 also strongly indicates the applicability of this same construction as it limits the liability of the United States to compensatory damages where the law of the place provides for damages only punitive in nature. Cf. State of Maryland to the Use of

Burkhardt v. United States, 4 Cir., 165 F.2d 869.

2. In that case a tradesman attempted to enter his customer tenant's premises over the janitor's opposition. The court held that the tradesman, after warning the janitor of his purpose, could use adequate force to remove him but that it was a jury question "whether the defendant used excessive physical force in removing the plaintiff as an obstruction to the exercise of his right to use the passage."

694

force to accomplish his lawful result may be liable for an assault where he uses excessive force.[2] And see Castner v. Sliker, 33 N.J.L. 507; West Jersey & Seashore R. R. Co. v. Welsh, 62 N.J.L. 655, 42 A. 736; Letts v. Hoboken R., Warehouse & Steamship Connecting Co., 70 N.J.L. 358, 57 A. 392; Rittenhoffer v. Cutter, 83 N.J.L. 613, 83 A. 873; Vitolo v. Nicotera Loan Co., 160 A. 89, 10 N.J.Misc. 624.

If we understand appellant's point correctly it centers around the proposition that the shooting of Lewis cannot be an assault and battery because Foote did not intend to shoot him. There are no New Jersey decisions cited which actually support that argument. Bouvier's definition of assault and battery as quoted in Tomlin v. Hildreth, 65 N.J.L. 438, 446, 47 A. 649, 651 is so urged. But it in nowise conflicts with the excessive force theory and finding of the court below.[3] Cerri v. United States, D.C.N.D. Cal., 80 F.Supp. 831, also relied on by appellant, is sharply distinguishable on its facts. There a sentry fired after a fugitive into a crowd of people and hit plaintiff, an innocent bystander. Cf. Edgin v. Talley, 1925, 169 Ark. 662, 276 S.W. 591, 42 A.L.R. 1194.

On the question of intention, the closest New Jersey case to the facts which we have seen is DeMarentille v. Oliver, 2 N.J. L. 379 [Reprint page 358], where plaintiff was sitting in a horse-drawn carriage when defendant struck the horse with a club causing it to run away with resulting injury to plaintiff. Justice Pennington thought that defendant's action constituted an assault upon the person of the plaintiff though his conclusion in that regard was really dictum. And see Clark v. Downing, 55 Vt. 259, 45 Am.Rep. 612; Bull v. Colton, 22 Barb., N.Y., 94; Singer Sewing Machine Co. v. Phipps, 49 Ind.App. 116, 94 N.E. 793.

Appellant·in this connection quotes with approval the definition of assault from Sec-

tion 21 of the Restatement of the Law of Torts. It is there stated that the intention necessary to constitute an assault is, among other things, an intention to put the other or a third person in apprehension of an immediate and harmful or offensive contact. This hardly helps appellant for it was precisely Foote's purpose in firing at Lewis. Section 13 of the Restatement of Torts in defining a battery conveys the identical thought saying, among other things, that the actor is liable if the act is done with the intention of bringing about an apprehension of a harmful or offensive contact. And see Prosser on Torts (1941 Ed.) p. 47.

There is evidence to support the lower court in finding that Foote used excessive force in the light of all the surrounding circumstances. We accept that finding as we must. With that finding properly in the case the conclusion on which it is based that Foote committed an assault and battery upon Lewis is sound law.

Appellant's other point is that he was not guilty of contributory negligence. The theory advanced is that his negligence in driving away, if he was negligent, did not contribute to the shooting. In support of this it is said in appellant's brief that "The plaintiff was not aware of the series of events which led up to the firing of the shots at the left rear wheel and a considerable interval elapsed." That statement is contrary to finding of fact #9 which reads in part: "It is found as a fact that Lewis did use profanity and was abusive on one or more instances on the date in question, and engaged in more than one altercation with the Marine and civilian police personnel of the naval reservation, * * *. Private Foote directed the occupants of the car, which was being driven by Kinney, that they would have to wait and Kinney stopped the car. The plaintiff Lewis instructed his employee Kinney to drive on in spite of the sentry's warning, but Kinney·

3. The quotation reads: "An 'assault' is defined as an unlawful offer or attempt, with force or violence, to do a corporeal hurt to another, and, when coupled with a battery, is an unlawful beating, or other wrongful physical violence or constraint, inflicted upon a human being without his consent. Bouv.Law Dictionary, Rawle's Third Rev., tit. 'Assault,' page 152; Id., tit. 'Battery,' page 192."

refused and Lewis ordered him to leave the car, which Kinney did, Lewis moving into the driver's seat and starting to drive away from the gate. Private Foote ran alongside the car and again instructed the plaintiff Lewis to stop the car, but Lewis continued to drive away from the gate."

As we have already seen, there was evidence, an important part of it by Lewis himself, justifying this finding and we agree with the contingent conclusion of law namely, that if Foote's action in shooting at the automobile did not constitute assault and battery but was considered to be an act of negligence in law, Lewis was guilty of contributory negligence because of his failure to stop when so ordered by the sentry.

Appellant, urging that his actions were merely conditions of the shooting not a part of the cause, argues that the shooting was not conceived by the sentry until he had driven away from the gate. That contention, if true, would be of no importance but even so it is not reasonably inferable from the evidence. The sentry, Foote, was under orders to hold the car. He knew he could not physically do so and from what he said, as above quoted, he was plainly prepared to use his pistol, if necessary, to stop it. Under general orders he had to use all means at his disposal to prevent Lewis from leaving the base. On his own story Lewis was aware of the specific danger that the sentry would use his weapon to stop the car from being driven away for only a few moments previous his own employee, Kinney, had flatly refused to drive the car off the base because, as he said, the sentry had a gun. Despite the apparent situation it was at that very time that Lewis made Kinney leave the automobile, and operating the car himself started away from the base. His deliberate action obligated the sentry under his orders to stop him if possible. The sentry obtained no compliance as a result of his commands to halt nor from his warning shots. To obey his orders and stop the car he had one resource left. He used it in firing at the tire. That consequence and the mischance of a stray bullet striking him, as we see it, was reasonably foreseeable by Lewis and directly precipitated by him.[4]

The judgment of the District Court will be affirmed.

4. See Kaufman v. Pennsylvania R. R. Co., 2 N.J. 318, 323, 66 A.2d 527, for the latest expression by the New Jersey Supreme Court of the rule that a plaintiff cannot recover if his own negligence contributes to his injury in such a way that if he had not been negligent he would not have been injured by defendant's action; also Card v. Carrigan, 137 N.J.L. 722, 61 A.2d 263; Harper v. Erie Railway Co., 32 N.J.L. 88.