ANA MARÍA JIMÉNEZ WIDOW OF ORTIZ, ETC. ET. AL., Plaintiffs and Appellees, *v.* THE PEOPLE OF PUERTO RICO, Defendant and Appellant.

No. 12163. Resubmitted May 29, 1961.—Decided June 30, 1961.

*J. B. Fernández Badillo, Secretary of Justice, Arturo Estrella, Assistant Secretary of Justice,* and *Juan Pedrosa, Jr., Assistant Attorney General,* for appellant. *Víctor Alberty Ruiz* for appellees.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On July 4, 1954, between 5:30 and 6:00 in the afternoon, state policeman Andrés Belén, who was on duty in the town of San Sebastián, had an argument with citizen Justino Ortiz Valentín. During said argument Ortiz referred to the officer in such terms as "bully" and "insolent." The policeman ordered him to keep quiet, and according to the testimony of one of the witnesses, he spoke to him in an aggressive manner. Several persons intervened and persuaded Ortiz to board a public service bus belonging to him and to leave the place.[1] Ortiz went to his home with two small children of his who were accompanying him. Officer Belén followed Ortiz' vehicle and when the latter got off in front of his house, the policeman, without further incident or provocation, fired a shot at him, thereby causing his death. According to the testimony of one of the witnesses, the policeman said "I'm looking for you, you scoundrel," when he fired the shot. The evidence does not clearly show that the original argument was motivated by any attempt on the part of officer Belén to lodge a complaint against Ortiz or arrest him;

---

[1] Witness Alberto Rodríguez Linares testified that after the victim left the scene of the argument, another policeman called Méndez, who was not wearing his uniform at the time, urged policeman Belén to pursue Ortiz "wherever he went." The trial court did not make any determination of fact whatsoever as to this point, and we are inclined to believe that it did not give it credit, specially considering the cross-examination of witness Mariano Ramos by the judge on this aspect of the facts.

it rather tends to determine that the deceased was not committing any crime whatsoever.[2]

On April 1, 1955, through Joint Resolution No. 5, the Legislative Assembly authorized Ortiz' widow and children to sue the People of Puerto Rico for the alleged damages suffered as a consequence of the death of the latter caused by the shot which state policeman Andrés Belén fired at him "while the latter was in uniform and on duty." They were expressly exempt from giving bail;[3] and were excused

---

[2] The findings of fact made by the trial judge as to the manner in which the unfortunate event took place reads as follows:

"(1) .        .        .        .        .        .        .        .

(2) That approximately between 5:20 and 6:00 p.m. of July 4, 1954, a strong argument took place on one of the streets of San Sebastián, between policeman Andrés Belén and Justino Ortiz Valentín, Jr.

(3) That the afore-mentioned policeman was in uniform and was riding a jeep accompanied by policeman Raúl Méndez, who was dressed in civilian clothes.

(4) That Justino Ortiz Valentín, Jr., was the owner and driver of a public bus and on that occasion he was accompanied by his small children.

(5) That when the argument started, the bus of Ortiz Valentín, Jr. was parked on the left-hand side of the street, where the vehicles are allowed to be parked.

(6) That a strong argument arose between Justino Ortiz Valentín, Jr. and policeman Andrés Belén, in which the deceased Ortiz Valentín, Jr., according to hearsay, called the policeman a bully and the latter ordered Ortiz Valentín to keep quiet as he unbuttoned his uniform coat.

(7) That in the course of the argument Justino Ortiz Valentín, Jr. never wrestled with or assaulted the policeman.

(8) That at the request of some bystanders, Justino Ortiz Valentín, Jr. boarded his bus, started it, and went with his small children towards his residence at Corton Street in San Sebastián.

(9) That then policeman Andrés Belén, always accompanied by Raúl Méndez, went after Justino Ortiz Valentín and he arrived when Ortiz Valentín was getting his children off the bus, they parked the jeep and policeman Andrés Belén alighted, holding a revolver in his hand, and while Ortiz Valentín, Jr. said to him: 'Don't kill me' and raised his hands, the policeman fired a shot at him, as a result of which Ortiz Valentín collapsed while policeman Andrés Belén did nothing to help him."

[3] This provision was unnecessary because since the enactment of Act No. 410 of May 11, 1951 (Sess. Laws, p. 1092), which amended § 4 of Act No. 76 of April 13, 1916 (Sess. Laws, p. 151, 32 L.P.R.A. § 3064),

"as to the prescription since the time elapsed was not to be computed"; [4] and they were authorized to bring an action regardless of whether The People of Puerto Rico had acted or not through a special agent when the above-mentioned death occurred.[5]

On April 22, 1955 the corresponding action to claim damages was brought by Ortiz' widow and their four children for the sum of $40,000. In its answer the Commonwealth alleged by way of defense that officer Belén "withdrew from the scope of his employment as state policeman in uniform and on duty," and therefore, his actions were illegal and ultra vires. It expressly accepted that officer Belén's actions for which liability is exacted occurred while the latter was in uniform and on duty.

The suit went to trial. Plaintiff presented her evidence which consisted in the testimony of four witnesses, the contents of which we have already set forth. The Commonwealth did not present evidence and relied on the special defense raised. The Superior Court, San Juan Part, relying on the fact that the Joint Resolution which authorized the plaintiff to bring the action was identical in its language to Act No. 412 of May 11, 1951 (Sess. Laws, p. 1096), which was considered in *Rodríguez* v. *People*, 75 P.R.R. 377 (1953), and on the fact that the same defense of unauthorized acts had been overruled in said opinion, granted the complaint

---

the request of furnishing bond in suits against the State had been eliminated.

[4] This provision was not necessary either, since in *Valiente & Cía.* v. *People*, 71 P.R.R. 605 (1950), it had been decided that the prescriptive period of an action under a special law authorizing suits not contemplated by Act No. 76 of 1916, *supra*, begins to run from the effective date of the special Act.

[5] As to the liability for the acts or omissions of a third party, § 1803 of the Civil Code (31 L.P.R.A. § 5142) was amended by Act No. 104 of June 29, 1955 (Sess. Laws, p. 550), and as to those of the Commonwealth the requisite that the Commonwealth is liable "when it acts through a special agent" was eliminated. The present rule is to the effect that "the State is liable *as a particular individual would be under the same circumstances and conditions.*"

and ordered the Commonwealth to pay the sum of $15,000 for damages caused. An appeal was taken from said judgment.

■ An Act authorizing a suit against the State does not impose upon the latter any obligation which it does not otherwise have. Its effect is merely the granting of a remedy as long as pursuant to the applicable principle there is substantive liability. *Ocasio* v. *People,* 79 P.R.R. 27 (1956) ; *M. Grau e Hijos* v. *People,* 51 P.R.R. 12 (1937). On the other hand, these special statutes should be construed strictly in favor of the State. *Santiago* v. *People,* 74 P.R.R. 196 (1952). We wish to point out that the mere fact that authority has been granted to sue does not necessarily imply that liability is admitted, and that the final result depends on the particular facts of each case and on the legal principles involved applicable to the specific situation under consideration. It is therefore possible to determine that under a special Act the Commonwealth is liable for the damages caused as a result of a certain accident; and that there is lack of liability under an Act couched in identical terms, but which refers to another accident. The important thing is not the language of the Act whereby the People consent to be sued, but rather the particular facts of each case.

■ Before discussing the aspect of the liability we should consider, on the possibility that it may affect our jurisdiction, the effect of Act No. 104 of June 29, 1955 (Sess. Laws, p. 550, 32 L.P.R.A. § 3077 *et seq.*), on the present cause of action. By virtue of Act No. 30 of June 11, 1957 (Sess. Laws, p. 59), it was provided that Act No. 104 was applicable to the causes of action which had arisen since June 29, 1954,[6] which apparently shows that it

---

[6] The statement of motives of the above-mentioned Act No. 30 clearly reveals that the legislative purpose was remedial, and that it was not intended to impair the causes of action which may have been filed in

covers the present case since the facts occurred on July 4 of said year. However, the same Act specifies that the judicial proceedings based on such facts already filed shall continue to be prosecuted until their termination, according to the legislation in effect at the time they were filed. Since the complaint in the present case was filed on April 22, 1955, its prosecution is governed by Joint Resolution No. 5 of April 1, 1955, and insofar as not provided therein, by the special Act then in effect which authorized suits against The People of Puerto Rico, that is, Act No. 76 of April 13, 1916, *supra*.[7]

██ Irrespective of whether or not the Commonwealth acted through a special agent, the scope of the provisions of the Joint Resolution which authorized the bringing of this suit is to render applicable to this case the general principles of agency, that is, as if it were a private employer, responsible for the acts of its agents or employees under particular circumstances. *Rodríguez v. People*, 75 P.R.R. 377, 379–80 (1953). In general terms, an employer is not liable for the

---

the courts, under more favorable conditions contained in the special laws which authorized their filings. Said statement reads as follows:

"Act No. 104 of June 29, 1955 provides in its section 8 that it shall be applicable only to causes of action arising after it takes effects, which leaves out of its scope cases that occurred relatively near the date of approval of said act, while, pursuant to the provisions of the Civil Code, the aggrieved party always has a given period to bring the proper action.

"The Legislature wishes to extend the provisions of the aforesaid act not only to causes of action arising after it took effect, but also to events that occurred during the year prior to that date. This authorization is evidently more equitable than the granting of special authorizations in particular cases."

[7] This question is very relevant if it is considered that pursuant to § 6 of Act No. 104 of June 29, 1955, *supra*, the authorization granted to sue the Commonwealth for damages does not cover actions "by reason of an act or omission of an officer, agent or employee...which constituted assault, battery *or any other offense against the person. . . .*" *Lewis v. United States*, 194 F.2d 689 (C.A. 3, 1952); *Stepp v. United States*, 207 F.2d 909 (C.A. 4, 1953); *Jones v. Federal Bureau of Investigation*, 139 F. Supp. 38 (Md. 1956); *cf. Tastor v. United States*, 124 F. Supp. 548 (Cal. 1954). See, also, *Federal Tort Claims Act provision excepting from coverage claim arising out of assault, battery, etc.*, 23 A.L.R.2d 574 (1952).

wrongful criminal and intentional acts of an employee, unless this conduct is due somehow to the employee's desire to serve, benefit or further his employer's business or interest. *Maysonet v. Heirs of Arcelay*, 70 P.R.R. 155 (1949); *Suárez v. Saavedra*, 60 P.R.R. 589 (1942); *Ochsrider v. Reading Co.*, 172 F. Supp. 830 (Pa. 1959); Prosser, Torts 354 *et seq.*, § 63 (2d ed. 1955); *The Growth of Vicarious Liability for Wilful Torts Beyond the Scope of the Employment*, 45 Har. L. Rev. 342 (1931); James, *Vicarious Liability*, 28 Tul. L. Rev. 161, 187 (1954). *Cf. Vicarious Criminal Liability*, 5 Vill. L. Rev. 682 (1960). Originally, this doctrine was based on the absence of a specific authorization of the employer to act thus, and the existence of a specific prohibition to that effect was considered to be very relevant. At present, the fact that there are express instructions forbidding the use of excessive force or violence in the performance of the office does not imply by itself that the employer is not liable. *Vázquez v. People*, 76 P.R.R. 556 (1954); *González v. Compañía Agrícola*, 76 P.R.R. 373 (1954); *Quiñones v. Tropical Beverages*, 74 P.R.R. 338 (1953); *Lloréns v. Lozada*, 73 P.R.R. 260 (1952); *Díaz v. Rodríguez*, 69 P.R.R. 495 (1949). The test of liability is whether notwithstanding the fact that it is a question of wrongful conduct, the act performed is reasonably related to the scope of the employment, or if the agent has been prompted by purely personal motives. *González v. Compañía Agrícola*, 76 P.R.R. 373 (1954); *Lloréns v. Lozada*, 73 P.R.R. 260 (1952); *Rivera v. Maldonado*, 72 P.R.R. 448 (1951); II Harper and James, The Law of Torts 1390, § 26.9 (1956).

*Rodríguez v. People*, 75 P.R.R. 377 (1953) is clearly distinguishable from the situation at bar. The evidence therein shows that a policeman had been entrusted with the special mission of pursuing and arresting plaintiff, who, according to the information received by the police, was operating a

clandestine still. In the execution of the order received, the policeman went to the place where plaintiff supposedly was and caught him stirring the fire under the still. When Rodríguez saw him he took flight to avoid his arrest and, as he fled, the agent fired two shots at him, piercing both his thighs. There is no doubt that the policeman was acting for the purpose of complying with the orders received and has a logical relation with the functions of his office. Under such circumstances, the violence or excessive force exercised by the agent does not automatically relieve the State from liability.

■ In the present case the evidence does not show any connection whatsoever between the death of plaintiffs' predecessor and the discharge by policeman Belén of his duties of office. As we pointed out in the summary of the facts, the evidence tends to point out rather that the deceased was not committing any crime whatsoever when the argument with the policeman took place, and that the incident ended apparently when the former went home. Even when it may be gathered that the agent acted moved by the anger or rage which the argument aroused in him, the essential element would always be lacking, that his act was due somehow to the purpose of protecting and benefiting the interests of the Commonwealth, for this is not, as in the *Rodríguez* case, a question of an incident occurred in the pursuit or attempt to arrest a person who was committing a crime. We do not see how this case may be distinguished from the situations considered in *Marrero* v. *López et al.*, 15 P.R.R. 746 (1909) and *Torres* v. *J. Lema & Co.*, 36 P.R.R. 72 (1926).

■ We have carefully considered the fact that in the joint resolution which authorized the filing of the suit, as well as in the answer of the Commonwealth, it is accepted that policeman Belén caused Ortiz' death "while . . . he was in uniform and on duty." This admission has no

special significance. The fact that a policeman is in uniform and on duty, in the absence of other circumstances, does not render the Commonwealth liable. The effect of the Joint Resolution was to allow plaintiff to establish that the policeman was acting within the scope of his employment, or at least, that the death of the deceased had some relation to the functions of his employment. *Cf. Doctrine of Apparent Authority as Applicable Where Relationship is that of Master and Servant*, 2 A.L.R.2d 406 (1948). It was in this aspect that plaintiffs did not succeed. Irrespective of the agent's condemnable and deplorable act because of its immediate consequences, we can not impose liability on the Commonwealth in the absence of a link—even a weak one—between the criminal act committed by the policeman and the defense or protection of the interests of the community. This family's misfortune has no other remedy than a legislative action directly granting the proper compensation. The applicable legal principles and doctrines preclude the courts from granting indemnity to plaintiffs.

The judgment rendered by the Superior Court, San Juan Part, on July 5, 1956, is reversed and judgment shall be rendered dismissing the complaint.

---

MR. JUSTICE SANTANA BECERRA, dissenting.

The Legislative Assembly enacted a Joint Resolution authorizing Ana María Jiménez widow of Ortiz for herself and representing her minor children "to sue The People of Puerto Rico for alleged damages suffered as a consequence of the death of her husband Justino Ortiz Valentín, Jr., father of the above-mentioned children, occurred on July 4, 1954, in San Sebastián, as a consequence of a shot *fired* at him by policeman Andrés Belén, *while the latter was in uniform and on duty*." Further on the Joint Resolution states that said complaint is authorized *regardless of whether The People of Puerto Rico had acted or not through*

*a special agent* when the above-mentioned death occurred." (Italics ours.)

The death occurred on July 4, 1954 and the complaint was filed on April 19, 1955, within a year. The only apparent reason for the legislative intervention, a problem of prescription not being in existence, was that of dispossessing The People of Puerto Rico in this case of the privilege given to the State under § 1803 of the Civil Code, of not being liable for criminal or quasi-criminal acts unless it had acted through a special agent. And in so doing, the Legislative Assembly reached a conclusion, which is amply supported by the evidence presented at the trial court to the effect that upon firing the shot the policeman was on duty.

The evidence in the record reveals that when the deceased left on the advise of the others who were there present, the policeman and Raúl Méndez, another agent dressed in civilian clothes, who was accompanying him, boarded a police jeep stationed at the scene of the argument and followed him. Several times a witness testified with self-assurance and firmness that when the victim left in his vehicle, the other officer told the policeman: "pursue him wherever he goes," without this evidence being contradicted by any one, not even by Méndez, who was under the rules of the court as a witness announced by the defendant. As a matter of fact, they pursued him in an official police vehicle "tracking him down" as one witness stated. The problem of credibility does not arise from the record, and if an inference is made, in my opinion it would be made in the sense that once the trial court granted the complaint, it gave credit to this testimony.

I dissent because I understand that once it has been proved, as the very Legislative Assembly determined, inter alia, and it is established by the evidence in the record, that when the shot was fired the policeman was on police duty,

that is, *in the service of the branch in which he was employed*—§ 1803—a *presumption* of guilt arose pursuant to a provision of the very § 1803 against defendant, which the latter was bound to destroy if he wished to be released, but failed to do so, unless it is concluded that the wrongful act itself, because it was excessive and unjustified, offers such a release. Such a premise would alter, as we have previously said, the doctrine of liability for the acts of another under § 1803. The excess itself in the service did not remove the event from the service.[1]

In the light of the Joint Resolution of the Legislative Assembly and of the facts in the record, I agree with the trial judge in that this case should be governed by the principles and by the doctrine set forth in *Rodríguez* v. *People*,

---

[1] Section 1803.—"The liability referred to in this section shall *cease* when the persons mentioned therein *prove* that they employed all the diligence of a good father of the family to avoid the damage." This provision directly charges and blames the employer. See: IV Castán, *Derecho Civil Español, Común y Foral—Responsabilidad por Hecho de Otro* 829 (8th ed.); Manresa, *Comentarios al Código Civil Español* 661 (5th ed.); Valverde, *Tratado de Derecho Civil* 791 (4th ed.). And see: Leonard A. Colombo, *Culpa Aquiliana* (quasi-crimes) *Responsabilidad por el Hecho Ajeno* 304, and *Responsabilidad Aquiliana del Estado* 411 *et seq.*

The record shows the following incident: (Witness Mariano Ramos testifies.)

"Q.—When they were arguing, what did Belén tell Nano? A—When I went out, because I was eating, what I heard Nano say to him was: 'You are a bully, you are very insolent,' that was what Nano was telling the policeman, and the policeman was ordering him to keep quiet, and at the same time he was getting ready to hit him with the billy . . . . Q.—Tell me, then is that what you heard? A—Yes, sir. Q.—How did you intervene in this matter, what did you do? A—When I became aware I intervened because my daughter and my wife were standing on the sidewalk, *and as I had heard that the policeman was a violent person, I feared he would use the gun* and that a bullet could possibly reach my daughter or my wife, and that is why I intervened with both of them and asked the boy to board the bus, and he did so, and I asked the policeman as a favor, several times, to leave, thus avoiding a tragedy. The policeman tried to board the bus and I crossed his path; at last he complied with my request and then Nano left; but the policeman went after him." There is also evidence to the effect that during the argument the policeman unbuttoned the gun pocket.

75 P.R.R. 377. The fact that he acted therein according to a previous order to perform a specific act and herein he did not, does not constitute, in my opinion, in the case of a policeman, a fundamental difference since the policeman is an employee who in the discharge of his duties has initiative, discretion, freedom of action and freedom to make determinations. That freedom of action is a risk assumed by the employer and which exposes him to liability of guilt *in eligendo* or *in vigilando*.

I believe the judgment should be affirmed.