ANA MARÍA JIMÉNEZ VDA. DE ORTIZ por sí y en representación de sus hijos menores ROBERTO, SONIA MARÍA, JOSÉ ANGEL y ANA EMILIA ORTIZ JIMÉNEZ, demandantes y recurridos, v. EL PUEBLO DE PUERTO RICO, demandado y recurrente.

Número 12163

*Reasignado*: 29 de mayo de 1961. *Resuelto*: 30 de junio de 1961.

202

*J. B. Fernández Badillo, Secretario de Justicia, Arturo Estrella, Secretario Auxiliar y Juan Pedrosa, Jr., Procurador Auxiliar,* abogados del recurrente; *Víctor Alberty Ruiz,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El día 4 de julio de 1954, entre 5:30 y 6:00 de la tarde, el policía estatal Andrés Belén, quien estaba prestando servicios en la población de San Sebastián, sostuvo una discusión con el ciudadano Justino Ortiz Valentín. Durante dicha discusión, Ortiz se dirigió al agente en términos de que era un "abusador" y un "atrevido". El policía ordenó se callara y, según el testimonio de uno de los testigos, se dirigió a aquél en actitud agresiva. Varias personas intervi-

nieron y lograron que Ortiz abordara una guagua de servicio público de su propiedad y se alejara del lugar.[1] Ortiz se dirigió a su hogar con dos hijos pequeños que le acompañaban. El agente Belén siguió el vehículo de Ortiz, y al éste desmontarse frente a su casa, el policía, sin que mediara ulterior incidente o provocación, le hizo un disparo, causándole la muerte. Hay una declaración que pone en labios del policía la expresión "te estoy buscando, bandolero", al momento de hacer el disparo. La prueba no establece claramente que la discusión original obedeciera a algún incidente con motivo de una tentativa del agente Belén de denunciar o arrestar a Ortiz; más bien tiende a determinar que el occiso no estaba cometiendo delito alguno.[2]

Mediante la Resolución Conjunta Núm. 5 de 1 de abril de 1955, la Asamblea Legislativa autorizó a la viuda e hijos de Ortiz a demandar al Pueblo de Puerto Rico por los alegados daños y perjuicios sufridos a consecuencia de la muerte

---

[1] El testigo Alberto Rodríguez Linares declaró que después que la víctima abandonó el escenario de la discusión, otro policía de apellido Méndez, que a la sazón no vestía de uniforme, conminó al agente Belén a que persiguiera a Ortiz "dondequiera que se metiera". El Tribunal de instancia no formuló determinación de hecho alguno sobre este punto, y nos inclinamos a creer que no le dio crédito, especialmente considerando el interrogatorio que hizo el magistrado al testigo Mariano Ramos sobre este aspecto de los hechos.

[2] Las determinaciones de hecho formuladas por el juez de instancia sobre la forma en que ocurrió el desgraciado suceso leen como sigue:

"(1) . . .

"(2) Que como entre 5:20 a 6:00 P. M. del día 4 de julio de 1954, se produjo una fuerte discusión en una de las calles del pueblo de San Sebastián entre el policía Andrés Belén y Justino Ortiz Valentín, Jr.

(3) Que el policía arriba referido estaba uniformado y andaba en un *jeep* acompañado del policía Raúl Méndez que estaba vestido de paisano.

(4) Que Justino Ortiz Valentín, Jr., era dueño y a la vez chófer de una guagua pública y en esa ocasión estaba acompañado de sus hijitos.

(5) Que la guagua de Ortiz Valentín, Jr., al comenzar la discusión, estaba detenida al lado izquierdo de la calle, que es el permitido para estacionarse vehículos.

(6) Que surgió una fuerte discusión entre Justino Ortiz Valentín, Jr. y el policía Andrés Belén en la que se oyó al interfecto Ortiz Valentín, Jr.

de éste con motivo del disparo que le hiciera el policía estatal Andrés Belén, "mientras éste se hallaba uniformado y en servicio". Expresamente se le relevó de la prestación de fianza; [3] se les dispensó de "lo relativo a la prescripción no debiéndose computar el tiempo transcurrido"; [4] y se les autorizó a iniciar la acción independientemente del hecho de que El Pueblo de Puerto Rico haya o no actuado a través de un agente especial al ocurrir la referida muerte". [5]

En 22 de abril de 1955 se inició la correspondiente acción por la viuda y los cuatro hijos de Ortiz en reclamación de daños y perjuicios por la suma de $40,000. En su contestación, el Estado Libre alegó por vía de defensa que el agente Belén "se apartó del marco de sus funciones como policía es-

---

llamar abusador al policía y a éste ordenarle a Ortiz Valentín que se callara mientras se desabrochaba el gabán de su uniforme.

(7) Que en el curso de la discusión nunca Justino Ortiz Valentín, Jr. forcejeó ni acometió contra el policía.

(8) Que a petición de algunos circunstantes, Justino Ortiz Valentín, Jr., se montó en su guagua, la prendió y se encaminó con sus hijitos hacia su residencia en la calle Corton de San Sebastián.

(9) Que entonces el policía Andrés Belén, acompañado siempre de su compañero Raúl Méndez se le fue detrás a Justino Ortiz Valentín llegando cuando Ortiz Valentín estaba desmontando sus hijitos de la guagua, parquearon el jeep y el policía Andrés Belén bajó del mismo, revólver en mano y mientras Ortiz Valentín, Jr. le decía: "No me mates" y levantaba las manos, el policía le hizo un disparo, desplomándose Ortiz Valentín mientras el policía Andrés Belén nada hacía por auxiliarle."

[3] Esta disposición era innecesaria debido a que desde la aprobación de la Ley Núm. 410 de 11 de mayo de 1951 (Leyes, pág. 1093), que enmendó el artículo 4 de la Ley Núm. 76 de 13 de abril de 1916 (Leyes, pág. 155, 32 L.P.R.A. sec. 3064) se había eliminado el requisito de prestación de fianza en los pleitos contra el Estado.

[4] Tampoco era necesaria esta reserva ya que en *Valiente y Cía.* v. *Pueblo*, 71 D.P.R. 646 (1950) se había resuelto que el término prescriptivo de una acción bajo una ley especial autorizando pleitos no cubiertos por la Ley Núm. 76 de 1916, supra, comienza a correr a partir de la fecha en que entra en vigor la ley especial.

[5] En cuanto se refiere a la responsabilidad por los actos u omisiones de un tercero, el artículo 1803 del Código Civil (31 L.P.R.A. sec. 5142) fue enmendado por la Ley Núm. 104 de 29 de junio de 1955 (Leyes, pág. 551) y respecto a los del Estado Libre se eliminó el requisito de que fuera "cuando obra por mediación de un agente especial". La regla actual es al efecto de que el Estado responde *en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular.*"

tatal uniformado y prestando servicios", y por tanto sus actuaciones fueron ilegales y *ultra vires*. Aceptó expresamente que los actos del agente Belén por los cuales se exige responsabilidad ocurrieron mientras éste se encontraba uniformado y prestando servicios.

Fue el pleito a juicio. La demandante practicó su prueba consistente en el testimonio de cuatro testigos, cuyo contenido hemos previamente reseñado. El Estado no presentó prueba y descansó en la defensa especial planteada. El Tribunal Superior, Sala de San Juan, fundándose en que la resolución conjunta que autorizó a la parte demandante a instar la acción era idéntica en su redacción a la Ley Núm. 412 de 11 de mayo de 1951 (Leyes, pág. 1097) que se consideró en *Rodríguez v. Pueblo*, 75 D.P.R. 401 (1953) y en que la misma defensa de actuaciones no autorizadas había sido desestimada en dicha opinión, declaró la demanda con lugar y condenó al Estado Libre a satisfacer la suma de $15,000 por los daños y perjuicios causados. Se apeló contra dicha sentencia.

 Una ley autorizando a instruir un pleito contra el Estado no impone a éste ninguna obligación que de lo contrario no tenga. Su efecto es meramente conceder un remedio, siempre que de acuerdo con los principios aplicables exista responsabilidad sustantiva. *Ocasio v. Pueblo*, 79 D.P.R. 28 (1956); *M. Grau e Hijos v. Pueblo*, 51 D.P.R. 13 (1937). Por otro lado, estos estatutos especiales deben ser interpretados en forma restrictiva a favor del Estado. *Santiago v. Pueblo*, 74 D.P.R. 211 (1952). Queremos significar que el mero hecho de que se haya concedido autorización para demandar no implica necesariamente que se admita responsabilidad, y que el resultado final depende de los hechos particulares de cada caso y los principios legales envueltos aplicables a la situación específica que se considera. Es por tanto posible que bajo una ley especial se haya determinado que el Estado es responsable de los daños causados con mo-

tivo de determinado accidente; y que haya ausencia de responsabilidad bajo una ley redactada en idénticos términos, pero que se refiere a otro accidente. Lo importante no es la redacción de la ley autorizando a demandar, sino los hechos particulares de cada caso.

■ Antes de la discusión del aspecto de responsabilidad, debemos considerar, por la posibilidad de que ello pueda afectar nuestra jurisdicción, el efecto de la Ley Núm. 104 de 29 de junio de 1955 (Leyes, pág. 551, 32 L.P.R.A. sec. 3077 et seq.) sobre la presente causa de acción. Mediante la Ley Núm. 30 de 11 de junio de 1957 (Leyes, pág. 61) se dispuso que la Ley Núm. 104 era aplicable a las causas de acción surgidas a partir del 29 de junio de 1954,(⁶) lo que aparentemente indica que cubre el presente caso por haber ocurrido los hechos en 4 de julio de dicho año. Sin embargo, la misma ley especifica que los procedimientos judiciales basados en dichos hechos ya incoados continuarán tramitándose hasta su terminación de acuerdo con la legislación vigente a la fecha de su radicación. Como la demanda del presente caso se radicó en 22 de abril de 1955, su tramitación se rige por la Resolución Conjunta Núm. 5 de 1 de abril de 1955, y en lo allí no provisto, por la ley especial entonces vigente que au-

---

(⁶) La exposición de motivos de la citada ley Núm. 30 revela claramente que el propósito legislativo fue reparador, y que en forma alguna se intentó perjudicar las causas de acción que pudieran estar presentadas ante los tribunales, bajo condiciones más favorables contenidas en las leyes especiales que autorizaron su iniciación. Dicha exposición lee como sigue:

"La Ley Núm. 104 de 29 de junio de 1955 dispone en su artículo 8 que será aplicable solamente a las causas de acción que surjan con posterioridad a su vigencia, lo que deja fuera de su alcance casos ocurridos con relativa proximidad a la fecha de aprobación de la referida ley, mientras conforme a lo dispuesto en el Código Civil, el perjudicado siempre tiene un cierto período para entablar la acción correspondiente.

"La Asamblea Legislativa desea hacer extensivas las disposiciones de la ley antes mencionada no sólo a las causas de acción surgidas después de su vigencia, sino también a hechos ocurridos durante el año anterior a esa fecha. Esta autorización es evidentemente más equitativa a la concesión de autorizaciones especiales en casos particulares."

torizaba demandas contra El Pueblo de Puerto Rico, o sea la Ley núm. 76 de 13 de abril de 1916, supra.([7])

El alcance de la disposición de la resolución conjunta que autorizó la iniciación de este pleito, independientemente de que el Estado Libre Asociado hubiese actuado o no por medio de un agente especial, es hacer aplicables a este litigio los principios generales de agencia, o sea, convertirlo en un patrono privado, responsable por las actuaciones de sus agentes o empleados en determinadas circunstancias. *Rodríguez* v. *Pueblo*, 75 D.P.R. 401, 404–405 (1953). En términos generales, un patrono no es responsable de los actos delictivos criminales e intencionales de un empleado, a menos que esta conducta responda en alguna forma al deseo de servir, beneficiar o fomentar el negocio o los intereses del patrono. *Maysonet* v. *Sucn. Arcelay*, 70 D.P.R. 167 (1949); *Suárez* v. *Saavedra*, 60 D.P.R. 605 (1942); *Ochsrider* v. *Reading Co.* 172 F.Supp. 830 (Pa. 1959); *Prosser on Torts* (2a ed., 1955) sec. 63, págs. 354 y sigtes.; *The Growth of Vicarious Liability for Wilful Torts Beyond the Scope of the Employment*, 45 Harv. L. Rev. 342 (1931); James, *Vicarious Liability*, 28 Tul. L. Rev. 161, 187 (1954). Cfr. *Vicarious Criminal Liability*, 5 Vill. L. Rev. 682 (1960). Originalmente esta doctrina descansaba en la ausencia de una autorización específica del patrono para actuar en tal forma, y se consideraba de gran relevancia la existencia de una prohibición específica al efecto. Actualmente, el hecho de que haya instrucciones

---

([7]) Esta cuestión tiene una gran relevancia si se considera que de acuerdo con el artículo 6 de la Ley Núm. 104 de 29 de junio de 1955, supra, la autorización concedida para demandar al Estado Libre en reclamación de daños y perjuicios, no cubre acciones "por acto u omisión de un funcionario, agente o empleado ... constitutivo de acometimiento, agresión *u otro delito contra la persona* ..." *Lewis* v. *United States*, 194 F.2d 689 (C.A. 3, 1952); *Stepp* v. *United States*, 207 F.2d 909 (C.A. 4, 1953); *Jones* v. *Federal Bureau of Investigation*, 139 F. Supp. 38 (Md. 1956); cf. *Tastor* v. *United States*, 124 F. Supp. 548 (Cal. 1954). Véase además, *Federal Tort Claims Act provision excepting from coverage claim arising out of assault, battery, etc.*, 23 A.L.R.2d 574 (1952).

expresas prohibiendo el empleo de fuerza o violencia excesiva en el ejercicio del cargo no implica por sí solo que el patrono no tenga responsabilidad. *Vázquez v. Pueblo,* 76 D.P.R. 594 (1954) ; *González v. Cía. Agrícola,* 76 D.P.R. 398 (1954) ; *Quiñones v. Tropical Beverages,* 74 D.P.R. 364 (1953) ; *Lloréns v. Lozada,* 73 D.P.R. 271 (1952) ; *Díaz v. Rodríguez,* 69 D.P.R. 533 (1949). El índice de responsabilidad es si a pesar de tratarse de conducta delictiva, el acto realizado tiene una relación razonable con las funciones del empleo, o si meramente el agente ha actuado movido por motivos personales. *González v. Cía. Agrícola,* 76 D.P.R. 398 (1954) ; *Lloréns v. Lozada,* 73 D.P.R. 271 (1952) ; *Rivera v. Maldonado,* 72 D.P.R. 479 (1951) ; Harper y James, *The Law of Torts,* 1956, vol. II, sec. 26.9, pág. 1390.

*Rodríguez v. Pueblo,* 75 D.P.R. 401 (1953) es claramente distinguible de la situación que consideramos. Allí la prueba demostró que un policía había recibido una encomienda específica de vigilar y arrestar al demandante, quien según confidencias recibidas, se dedicaba a operar un alambique clandestino. En cumplimiento de las instrucciones recibidas, el policía se dirigió al lugar en donde supuestamente se encontraba el demandante y efectivamente le sorprendió atizando un alambique. Al ser sorprendido, Rodríguez intentó escapar, y mientras huía para evitar el arresto, recibió dos disparos de revólver hechos por el agente que le atravesaron ambos muslos. No hay duda de que la actuación del policía obedeció al propósito de cumplir las instrucciones recibidas y tiene una relación razonable con el cumplimiento de las funciones del cargo. Bajo tales circunstancias, el empleo de violencia o fuerza excesiva por el agente, no releva automáticamente de responsabilidad al Estado.

En el presente caso, la prueba no demuestra que haya conexión alguna entre la muerte del causante de los demandantes y el ejercicio por el policía Belén de las funciones de su cargo. Como indicamos en el resumen de los hechos, la

evidencia tiende más bien a señalar que el occiso no estaba cometiendo delito alguno cuando tuvo lugar la discusión con el policía, y que este incidente aparentemente terminó cuando aquél se retiró a su hogar. Aun cuando pueda inferirse que el agente actuó motivado por la ira o cólera despertada en su ánimo con motivo de la discusión aludida, siempre faltaría el elemento esencial de que su acto respondiera en alguna forma al propósito de proteger o beneficiar los intereses del Estado, pues no se trata como en el caso de *Rodríguez*, de un incidente ocurrido en la persecución o intento de arresto de una persona que estaba cometiendo un delito. No vemos cómo pueda distinguirse este caso de las situaciones consideradas en *Marrero* v. *López*, 15 D.P.R. 766 (1909) y *Torres* v. *Lema & Co.*, 36 D.P.R. 80 (1926).

Hemos dado cuidadosa consideración al hecho de que tanto en la resolución conjunta que autorizó la presentación del pleito, como en la contestación formulada por el Estado, se acepta que el policía Belén causó la muerte de Ortiz "mientras... se hallaba uniformado y en servicio". Esta admisión no tiene especial significación. El hecho de que un policía esté uniformado y se encuentre prestando servicios, en ausencia de otras circunstancias, no hace responsable al Estado. El efecto de la resolución conjunta fue permitir que la parte demandante pudiese establecer que el policía actuaba dentro del marco de sus atribuciones, o cuando menos, que la muerte del occiso tenía alguna relación con las funciones de su empleo. Cfr. *Doctrine of Apparent Authority as Applicable where Relationship is That of Master and Servant*, 2 A.L.R.2d 406 (1948). En este aspecto fue que los demandantes no tuvieron éxito. Independientemente del acto condenable del agente, y deplorable por sus consecuencias inmediatas, no podemos imponer responsabilidad al Estado en ausencia de un vínculo—aunque fuera tenue—entre el acto delictivo cometido por el policía y la defensa o protección de los intereses de la comunidad. La desgracia de esta familia no

tiene otro remedio que una actuación legislativa concediendo directamente la compensación debida. Los principios y doctrinas de ley aplicables impiden a los tribunales conceder reparación a los demandantes.

*Se revocará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 5 de julio de 1956, y se dictará sentencia declarando sin lugar la demanda.*

---

Opinión disidente del Juez Asociado Sr. Santana Becerra.

La Asamblea Legislativa aprobó una Resolución Conjunta autorizando a Ana María Jiménez viuda de Ortiz por sí y en representación de sus menores hijos, "a demandar a El Pueblo de Puerto Rico por alegados daños y perjuicios sufridos a consecuencia de la muerte de su esposo y padre de sus hijos mencionados, Justino Ortiz Valentín, hijo, ocurrida el día 4 de julio de 1954, en San Sebastián, a consecuencia de un disparo de revólver *hecho* por el Policía Estatal Andrés Belén, *mientras éste se hallaba uniformado y en servicio"*. Más adelante expresa la Resolución Conjunta que se autoriza dicha demanda *"independientemente del hecho de que El Pueblo de Puerto Rico haya o no actuado a través de un agente especial* al ocurrir la referida muerte. [El énfasis se ha suplido].

La muerte ocurrió el 4 de julio de 1954 y la demanda se radicó en 19 de abril de 1955, dentro del año. La única razón que aparentemente hubo para la intervención legislativa, no existiendo un problema de prescripción, fue la de desposeerse en este caso El Pueblo de Puerto Rico del privilegio que se dio el estado bajo el artículo 1803 del Código Civil de no responder en daños delictuales o cuasidelictuales a menos que hubiere obrado a través de un agente especial. Y al así hacerlo, la Asamblea Legislativa hizo una conclusión, que está ampliamente sostenida por la prueba que desfiló ante la Sala sentenciadora, al efecto de que al hacer el disparo, el policía se hallaba en servicio.

La prueba en autos revela que al retirarse el interfecto por consejo de otros allí presentes el policía y otro agente que le acompañaba vestido de paisano de nombre Raúl Méndez, montaron en un *"jeep"* de la policía estacionado en el sitio de la discusión, y lo siguieron. Por varias veces un testigo manifestó con aplomo y firmeza que al irse la víctima en su vehículo, el otro agente dijo al policía: "persíguelo dondequiera que se meta", sin que esta prueba aparezca desmentida por nadie, ni siquiera por Méndez que estaba bajo las reglas de la Corte como testigo anunciado por el demandado. Como cuestión de realidad lo persiguieron en un vehículo oficial de la Policía "pisándole los talones" como expresó un testigo. Del récord no surge problema de credibilidad, y de hacerse alguna inferencia, a mi juicio sería en el sentido de que toda vez que la Sala sentenciadora declaró con lugar la demanda, dio crédito a este testimonio.

Disiento por entender que una vez probado como lo determinó *inter alia* la propia Asamblea Legislativa y demuestra la prueba en el récord, que al ocurrir el disparo el policía estaba en el servicio de policía, o sea, *en el servicio del ramo en que lo tenían empleado,*—artículo 1803—, surgió por disposición del propio artículo 1803 una *presunción* de culpa contra el demandado que éste venía obligado a destruir si quería su exoneración, y no lo hizo, a menos se concluya que el acto culposo mismo, por haber sido en exceso e injustificado, ofrece tal exoneración. Una premisa así desvirtuaría, como ya lo expresamos en otra ocasión, la doctrina de responsabilidad por actos de otro del artículo 1803. El exceso en el servicio por sí mismo no sacó el hecho fuera del servicio. ([1])

---

([1]) Art. 1803.—"La responsabilidad de que trata este artículo *cesará* cuando las personas en él mencionadas *prueben* que emplearon toda la diligencia de un buen padre de familia para prevenir el daño". Esta disposición imputa culpa directamente al empresario. Véase: Castán, Derecho Civil Español, Común y Foral, 8a. ed. Tomo IV "Responsabilidad por hecho de otro", pág. 829; Manresa, Comentarios al Código Civil Español, 5ta. ed., pág. 661 Valverde, Tratado de Derecho Civil, 4ta. ed., pág. 791. Y véase: Leonardo A. Colombo, Culpa Aqui-

A la luz de la Resolución Conjunta de la Asamblea Legislativa y de los hechos en el récord, convengo con el distinguido Juez sentenciador en que este caso debe regirse por los principios y por la doctrina sentada en el de *Rodríguez* v. *Pueblo*, 75 D.P.R. 401. El hecho de que allí se actuara bajo una orden previa de realizar determinado acto, y aquí no, no constituye para mí, en el caso de un policía, fundamental diferencia, ya que el policía es un funcionario que en el desempeño de sus deberes posee iniciativa, discreción, libertad de acción y libertad de hacer determinaciones. Esa libertad de acción es un riesgo que asume el empresario y que lo expone a responsabilidad de culpa *in eligendo o in vigilando*.

Soy de opinión que la sentencia debería confirmarse.

---

liana (cuasidelitos) "Responsabilidad por el hecho ajeno", pág. 304 y "Responsabilidad Aquiliana del Estado", pág. 411 et seq.

El récord demuestra el siguiente incidente: (Declara el testigo Mariano Ramos)

"P.—¿Cuando discutían, qué fue lo que le dijo Belén a Nano? R.—En el momento que salí, porque yo estaba comiendo, lo que yo oí que Nano le decía fue: 'Usted es un abusador, usted es un atrevido', eso se lo decía Nano al policía, y el policía lo mandaba a que se callara, y al mismo tiempo venía en disposición de agredirle con la macana..... P.—¿Dígame, entonces eso fue lo que usted oyó? R.—Sí señor. P.—Cuál fue su intervención en este asunto, qué fue lo que usted hizo? R.—Al yo darme cuenta, la intervención mía obedeció, a que yo tengo mi hija y mi esposa en la acera *y como yo había oído decir que el guardia ése era un guardia violento, temí que hiciera uso del revólver* y una bala alcanzara a mi hija o a mi esposa y por eso intervine con los dos y le pedí al muchacho que se entrara a la guagua y él así lo hizo, y le pedí al policía por favor, varias veces, que se alejara, para evitar una tragedia. El policía intentó entrar a la guagua y yo me le interpuse; por fin accedió a mi súplica y entonces Nano siguió; pero el policía se le fué detrás." Hay prueba también de que durante la discusión el policía desabotonó la funda del revólver.