FERMINA NEGRÓN DE LEÓN, PEDRO ORTIZ RODRÍGUEZ y BRÍGIDA RAMOS RAMOS, demandantes y apelantes, *v.* HÉCTOR RAFAEL OROZCO RIVERA, LA POLICÍA DE PUERTO RICO, y EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandados y apelados.

*Número:* O-82-620    *Resuelto:* 12 de enero de 1983

*Roberto Busó Aboy,* abogado de los recurrentes; *Miguel Pagán,*

*Procurador General Interino,* y *Gerardo Mariani Padilla, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

Los hechos que dan lugar a esta acción de daños y perjuicios promovida por la viuda y los padres de Benjamín Ortiz Ramos, muerto a tiros por el policía Héctor Rafael Orozco en el cuartel de Aguas Buenas están resumidos por la sala de instancia así:

La prueba que tuvo ante sí el Tribunal fue que Benjamín Ortiz Ramos y Héctor Rafael Orozco Rivera sostuvieron una discusión acalorada en una carretera de Aguas Buenas por motivos personales de ambos y mientras el último se hallaba fuera de servicio y en gestiones totalmente ajenas al servicio público. En dicho lugar se insultaron y se profirieron mutuamente palabras obscenas.

El Sr. Benjamín Ortiz fue a querellarse al Cuartel de la Policía de Aguas Buenas, y estando allí llegó el policía Orozco quien informó que había tenido problemas con un individuo y al ver allí a Benjamín Ortiz lo señaló como la persona a quien se estaba refiriendo. En esos momentos sólo hubo un intercambio de palabras (es importante señalar que en ningún momento hubo en el retén forcejeo alguno o intento de agresión por alguna de las partes, según la prueba desfilada).

En esos momentos el Sargento Pérez dijo que por tratarse de un guardia tenía que encargarse de la investigación del caso un sargento. El sargento Alcázar se hace cargo de la investigación e inmediatamente procede a separar del sitio del retén a los querellantes, llevándose consigo al Policía Orozco a un cuarto aparte el cual se utiliza para hacer las investigaciones y comienza [a] hacer la misma. A todo esto, Benjamín Ortiz permanece afuera en el retén.

Mientras estaba el Sargento Alcázar haciendo la investigación de lo sucedido, llama al Sargento Pérez y cuando el Sargento Pérez va entrando al cuarto detrás de él, sin haberlo llamado nadie, fue Benjamín Ortiz e inmediatamente le repite unas palabras obscenas [(1)] al policía Orozco y éste rápi-

---

(1) No hay tal elemento de obscenidad si nos referimos al testigo presente

damente sacó su revólver y le disparó hasta ocasionarle la muerte.

Es importante señalar que de la prueba desfilada se estableció que el día de los hechos que dan origen a la demanda, el policía Orozco se encontraba fuera de sus funciones como Policía y que estaba reportado enfermo y bajo tratamiento médico hacía varias semanas.

El pleito de daños y perjuicios contra el policía Orozco y su empleador el Estado Libre Asociado fue a juicio y al terminar la presentación de prueba por la parte demandante, el Gobierno formuló moción de insuficiencia (*nonsuit*) basada en el consentimiento limitado del Estado para ser demandado que deja fuera actos intencionales de naturaleza criminal de sus funcionarios que ni fomentan ni sirven a sus intereses. *Jiménez* v. *El Pueblo*, 83 D.P.R. 201 (1961). El Tribunal Superior desestimó la demanda por entender que la reclamación estaba circunscrita al acto criminal del agente Orozco y absolvió perentoriamente al Gobierno de responsabilidad por los graves daños causados a los demandantes. Éstos interpusieron recurso de revisión al que este Tribunal proveyó el 4 noviembre, 1982 con orden al Gobierno para mostrar causa por la que no deba revocarse la decisión recurrida "considerando que hubo negligencia del Estado en no proveer la necesaria seguridad y protección al ciudadano querellante Benjamín Ortiz para impedir el previsible resultado de violencia en que perdió la vida dicha persona en el propio Cuartel de la Policía".

El escrito-contestación del Estado evade la cuestión señalada, concentra su argumento en defensa de la constitucionalidad de la Ley que autoriza pleitos contra el Estado y a tal punto rindió su posición ante el ataque de los deman-

---

Sgto. Alfredo Pérez que en su declaración narra: "En esos momentos el Pol. Orozco me llama para que pasara al Cuarto de Informes y cuando voy caminando hacia el cuarto, Benjamín aprovecha y se me viene detrás y volvió a repetirle al guardia Orozco que éste era guapo porque estaba entre los suyos y su gallinero pero que no se atrevía pegarle un tiro con ese casco de revólver. Orozco hace uso de su revólver y le hace varios disparos a Benjamín."

dantes (²) a la resolución recurrida basado en previsibilidad e incumplimiento del deber de cuidado en la Policía para con el ciudadano Ortiz Ramos, manifiesta en alto relieve en la declaración jurada (³) del sargento Alfredo Pérez presentada en evidencia y que no impugna el Estado.

---

(²) Los demandantes formulan correctamente la relación causal entre negligencia de la Policía y la muerte del querellante a las págs. 6 y 7 de su solicitud de revisión al expresar:

"Los hechos ante este Honorable Tribunal demuestran claramente que la policía de Puerto Rico, en el Cuartel de Aguas Buenas, tenía conocimiento del altercado que había ocurrido entre Benjamín Ortiz y Héctor Orozco, antes de llegar estas personas al Cuartel. Además, tenían conocimiento de la queja formulada por Benjamín Ortiz, a los efectos de que Héctor Orozco le había encañonado momentos antes con un arma de fuego. También sabían que Orozco estaba armado. Benjamín Ortiz no estaba armado. En adición a esto, en el propio Cuartel y en presencia de los policías que han testificado, tanto por la parte demandante como por el Estado Libre Asociado, comenzaron una vez más el altercado. La policía no tomó la acción razonable para evitar un daño obviamente previsible. Cuando menos, requería desarmar a Orozco, quien no solamente estaba peleando dentro del Cuartel, sino que había sido acusado de encañonar a la persona con quien peleaba momentos antes de llegar al Cuartel. Además, al separar a las personas, no tomaron medidas que evitaran la reunión de los mismos, a pesar de su estado de ánimo. No hay que ser más que un hombre promedio para poder prever que en una situación de esta naturaleza existe la posibilidad real de que se utilizara el arma de fuego por parte de Orozco y que la verdadera medida de prudencia era desarmarlo en el Cuartel."

(³) Dice así:

"Hoy 4 de enero de 1978, hora 11:20 A.M. se personó al Cuartel de la Policía de Aguas Buenas el ciudadano Benjamín Ortiz Ramos c/p Choby, a querellarse de que un individuo le había apuntado con un revólver. En esos momentos hace presencia en el Cuartel el Policía Héctor Rafael Orozco a informar que había tenido problemas con un individuo el cual le había dicho cabrón frente a su esposa. Benjamín reconoce al guardia como que fue la persona que le había encañonado con un revólver; y el Policía Orozco reconoce a Benjamín como la persona que momentos antes le había dicho cabrón delante de su esposa. Surge un intercambio de palabras; Benjamín le dice a Orozco 'tú me apuntaste con el revólver pero no eres macho para usar ese casco de revólver.' Intervengo y paro la discusión y le digo al Sgto. Manuel Alcázar 8–89 'que tratándose de un guardia un sargento tenía que hacerse cargo de la investigación, y éste me dijo que él se haría cargo de la misma. El Sgto. Alcázar pasa al Pol. Orozco al Cuarto donde se confeccionan los informes en unión a su esposa, su padre Heriberto Orozco y de un menor. Yo me quedo en la parte del frente de la mesa de retén para tratar de que las partes no volvieran a reanudar la discusión. En esos momentos el Pol. Orozco me llama para que pasara al Cuarto de Informes y cuando voy caminando hacia el cuarto, Benjamín aprovecha y se me viene detrás y volvió a repetirle al guardia Orozco que

■ La causa eficaz y determinante de la muerte de Benjamín Ortiz Ramos es una compuesta por el acto afirmativo del policía Héctor Rafael Orozco al disparar el revólver contra su antagonista, y por la omisión negligente de los miembros de la Policía a cargo de la seguridad y orden en el cuartel de Policía de su deber de evitar la confrontación directa entre estas personas y de proteger a un ciudadano quejoso que allí acudió desarmado en busca de reparación de agravio, de la reacción del guardia querellado a quien se mantuvo en posesión de su arma de reglamento. Del acto criminal del policía no responde el Estado ya que el Art. 6(d) de la Ley Núm. 104 de 29 junio, 1955 (32 L.P.R.A. sec. 3081(d)) excluye la acción civil de daños y perjuicios por acto de funcionario constitutivo de agresión u otro delito contra la persona; y por no percibirse en el acto en sí de dar muerte preponderancia de un elemento de negligencia sobre el de conducta criminal que abriría paso a indemnización por el Estado bajo la doctrina de *Galarza Soto* v. *E.L.A.*, 109 D.P.R. 179 (1979). Sin embargo, el palio de inmunidad no ampara la omisión negligente por la Policía del deber de proteger la vida en el cuartel.

■ Hubo esa omisión negligente separada y distinta de la agresión, por parte de los miembros de la Policía que atendieron la queja e iniciaron una investigación en el propio cuartel sin tomar las medidas de elemental prudencia y cautela dentro de las circunstancias con lo cual se quebró la garantía de seguridad, y se incumplió la obligación de proteger la vida del querellante occiso aun de sus propios impulsos y acción inconsulta. Conocida la tirantez y hostilidad, y el estado de ánimo entre ciudadano y policía generados por el encuentro acabado de ocurrir y que se manifiestan vivas en el propio cuartel, era enteramente previ-

---

éste era guapo porque estaba entre los suyos y su gallinero pero que no se atrevía pegarle un tiro con ese casco de revólver. Orozco hace uso de su revólver y le hace varios disparos a Benjamín."

sible(4) para el hombre común, y en mayor grado para la Policía en contacto día tras día con la conducta violenta de sus intervenidos, una nueva explosión de violencia entre estas personas y la posibilidad de que el único armado de ellos respondiera a la provocación a tiros. En el hombre la pasión desbordada tarda más que el agua de creciente en retornar a su cauce. "La culpa consiste en la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso. [Cita omitida.] La diligencia exigible es la que cabe esperar del ser humano medio, el buen *pater familias*. Si el daño es previsible por éste hay responsabilidad." *Jiménez* v. *Pelegrina Espinet*, 112 D.P.R. 700, 704 (1982).

El cuartel de Policía debe ser siempre reducto de máxima seguridad para quien allí busca asilo contra la persecución o la corrección de un agravio. Es el centro de audiencia original, el primero en orden cronológico, que ha de responder al hombre en busca de justicia; donde se inicia la restauración y remedio al orden social perturbado por la conducta del querellado. Tiene por tanto una dignidad y debe proveer una garantía de trato justo que propiamente corresponde a la primera puerta que se toca en reclamo de justicia penal. Como la Policía es un cuerpo armado para mantener el orden y enfrentarse a la conducta violenta, su casa que es el cuartel debe no sólo representar, sino efectivamente ofrecer al pueblo a quien sirve, óptimas condiciones de seguridad. La muerte de un ciudadano desarmado, en terrible desigualdad, a manos de un policía y ejecutada en el propio cuartel, estremece la conciencia civilizada, y es mancha en nuestra cultura dirigida por un avanzado orden constitucional de reverencia por la vida y todos los demás derechos fundamentales del hombre.

---

(4)"Hay responsabilidad únicamente si el demandado es negligente al no tomar medidas contra el posible crimen, si el riesgo previsible es mayor que el de tipo común y corriente." William L. Prosser, *Handbook of the Law of Torts*, 4ta ed., St. Paul, Minnesota, West Publishing Co., 1971, págs. 175-176.

■ Con conocimiento, o simplemente con razonable sospecha, de que el policía contra quien se quejaba el ciudadano estaba armado dentro de un recinto donde era mínima la distancia entre uno y otro, en su propia protección, y en la de probables víctimas de la violencia, sería inconcebible que el oficial a cargo de la investigación no tome las medidas necesarias para determinar si en efecto alguien porta un arma y así extirpar la amenaza de daño físico. *Cf. Terry* v. *Ohio*, 392 U.S. 1, 24 (1967).

■ La falta de diligencia de la Policía en desarmar al querellado abrió vía y oportunidad a su violencia criminal. "Hay situaciones en las que una responsabilidad especial descansa en el demandado para protección del demandante, o en que una especial tentación y oportunidad de conducta criminal facilitada por el demandado, le impondrán el deber de tomar precauciones contra su ocurrencia." Esa responsabilidad especial se concreta si el demandado está en posición de controlar al propio ofensor y se le considera en la obligación de contenerlo, y la misma se extiende a cualquier persona perjudicada por su falta de ejercicio de cuidado razonable. William L. Prosser, *Handbook of the Law of Torts*, 4ta ed., St. Paul, Minnesota, West Publishing Co., 1971, págs. 174–175.

Sin embargo, no estuvo el causante de los demandantes totalmente libre de culpa en el desencadenamiento de hechos que desembocaron en su extinción. Como era enteramente predecible en su estado de cólera, él no se mantuvo quieto en el área de retén donde aguardaba por el curso de la investigación, y por el contrario caminó sin restricción la corta distancia que le separaba de la habitación donde se interrogaba a su adversario y en un descuido del sargento Pérez llamado por el policía Orozco entró allí y retó al policía querellado a que le pegara un tiro si era guapo y estaba entre los suyos, palabras que pudieron ser factor exacerbante de la desproporcionada reacción de aquél. Aun dominado el panorama total del caso por la crasa negligen-

cia de la Policía que viabilizó el episodio final de conflicto en que las balas acallaron las palabras, la prueba hasta ahora establece un caso prima facie de negligencia comparada entre la responsabilidad del Estado y la atribuible a la iniciativa imprudente de la víctima.

Con estos antecedentes y fundamentos *ha de expedirse el auto, revocar la sentencia revisada y devolver el caso a instancia para continuación de procedimientos compatibles.*