MANUEL ÁNGEL GALARZA SOTO y CARMEN MARTÍ DE GALARZA por ellos y en representación de su hijos menores de edad, JUAN, OLGA, ÁNGEL LUIS y ÁNGEL MANUEL, de apellido GALARZA–MARTÍ, demandantes y recurrentes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, ARQUELIO SEPÚLVEDA y MANUEL TORRES, demandados y recurridos.

*Número:* R-78-249      *Resuelto:* 7 de noviembre de 1979

180

*Francisco Vincenty Gronau* y *Elías González Mathews,* abogados de los recurrentes; *Héctor A. Colón Cruz, Procurador General,* y *Federico Cedó Alzamora, Procurador General Auxiliar,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Procede revocar la sentencia dictada por el Tribunal Superior. Los hechos que encuentra probados establecen la responsabilidad del Estado Libre Asociado.[1]

---

[1] No procede entrar a considerar la validez constitucional de la Ley Núm. 104 de 1955 (32 L.P.R.A. sec. 3077 *et seq.*). El recurrente no ha impugnado en instancia ni ante este Tribunal la validez de dicha ley. En *E.L.A.* v. *Aguayo,* 80 D.P.R. 552, 596

Veamos los hechos en que se basa la reclamación. Dos agentes del orden público vestidos de paisano caminaban por una carretera del interior como a las once de la noche tras la pista de un prófugo conocido por Toño Bicicleta. Ordenaron detenerse al demandante. Éste no obedeció la orden. Uno de los agentes disparó hiriéndolo. Sufrió serios daños. Demandó para resarcirse. El tribunal de instancia desestimó la acción interpuesta. Entendió que lo dispuesto en la Ley Núm. 104 de 1955, sec. 6(d), lo impedía.

La Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955, autoriza demandar al Estado Libre Asociado de Puerto Rico en acciones por daños y perjuicios a la persona o a la propiedad causados por acción u omisión de cualquier funcionario agente, o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia.

El Art. 6(d) de la citada ley aclara que ninguna parte de la misma autoriza las acciones por daños y perjuicios contra el Estado por acción u omisión de un funcionario, agente o empleado constitutivo de acometimiento, agresión u otro delito contra la persona.

Así el Estado renuncia su inmunidad en casos de negligencia pero la conserva cuando la actuación del agente constituye un delito. El Código Penal de Puerto Rico dispone que nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o negligencia criminal. Añade que la intención o negligencia se manifiestan por las circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y

---

(1958), consignamos como principio de derecho constitucional lo expuesto por el Juez Brandeis en *Ashwander* v. *Tennessee*, 297 U.S. 288, 348 (1935), al efecto de que "[c]uando se cuestiona la validez de una ley del Congreso, y aun cuando se suscite una duda seria sobre su constitucionalidad, es un principio cardinal que esta Corte primero se asegurará de si existe una interpretación razonable de la ley, que le permita soslayar la cuestión constitucional".

conducta de la persona. Comentando el Código Penal español, Cuello Calón([2]) señala lo siguiente:

"[E]ntre el dolo y la culpa no existe una separación tajante, de una a otra forma de culpabilidad se pasa por grados intermedios....

En nuestro Código penal no se halla una expresa división cual sucede en otras legislaciones, de las formas de culpabilidad, pero no obstante el silencio del texto aparecen en él las dos formas tradicionales de la culpabilidad, el dolo y la culpa. La primera se identifica con la voluntad intencional, la segunda con la imprudencia o negligencia."

Nuestro Código Penal establece—Art. 14—que la culpabilidad—elemento constitutivo del concepto de delito— tiene dos formas: la intención criminal o la negligencia. Aunque la responsabilidad penal puede ser a base de cualquiera de estas dos formas, hay contextos en los cuales la distinción entre negligencia e intención criminal alcanza consecuencias de índole práctica. Justamente al aplicar la Ley Núm. 104 de 1955, es necesario distinguir entre el delito intencional y la negligencia, ya que lo que el estatuto requiere es que el elemento de negligencia o descuido en la actuación del agente supere cualquier grado de responsabilidad criminal presente en su conducta. Al así interpretarlo cumplimos con la intención legislativa de que el Estado responde por los actos negligentes de sus empleados. En este caso los agentes del orden público actuaron negligentemente al disparar contra una persona bajo circunstancias que le impedían a éstos tener la certeza necesaria, sobre la identidad de la persona, que justificara sus actos.

Como expresamos en *Vda. de Valentín* v. *E.L.A.*, 84 D.P.R. 112, 119 (1961), "[l]a responsabilidad *Aquiliana* del Estado por negligencia del empleado no se desvanece por el hecho de que tal negligencia resulte también penada por ley, bajo una interpretación de conjunto y no trunca, de dicha Ley 104." Véase, también *Montes* v. *Fondo del Seguro del Estado*, 87 D.P.R. 199, 206 (1963).

---

([2]) Cuello Calón, *Derecho Penal*, 16ta edición, 1971, T. I, Vol. I, págs. 419-20.

*En vista de lo anterior el Estado Libre Asociado de Puerto Rico debe responder de los daños causados en el presente caso hasta el límite que preceptúa la mencionada Ley Núm. 104 de 1955.*

El Juez Asociado Señor Rigau emitió opinión concurrente en parte y disidente en parte a la cual se une el Juez Presidente Señor Trías Monge. El Juez Asociado Señor Díaz Cruz concurre en el resultado de la opinión emitida por el Juez Asociado Señor Rigau, pero se une a la opinión del Tribunal. El Juez Asociado Señor Irizarry Yunqué se une a la opinión del Juez Asociado Señor Rigau y emite además opinión separada expresando el criterio de que la Ley Núm. 104 de 1955 es inconstitucional, pero a la vez se une a la opinión del Tribunal. El Juez Asociado Señor Negrón García no intervino.

—O—

Opinión disidente en parte y concurrente en parte del Juez Asociado Señor Rigau a la cual se une el Juez Presidente Señor Trías Monge.

I

Mientras Miguel A. Galarza Soto, persona que no estaba acusada de delito público ni era prófugo de la justicia, transitaba como a las 11:00 de la noche, por un camino público en jurisdicción de Añasco, Puerto Rico, dos policías en ropa de civil, le abrieron fuego por la espalda, hiriéndole en la cabeza y en la espalda, ocasionándole lesiones graves. El hombre se salvó, auque quedó parcialmente incapacitado, y demandó al Gobierno de Puerto Rico en daños y perjuicios, reclamando $100,000 para sí, $50,000 para su esposa por sufrimientos mentales y $10,000 por el mismo concepto para cada uno de sus 4 hijos menores de edad.

Para la época en que ocurrieron los hechos la policía buscaba un prófugo llamado Francisco García a quien la prensa del país había denominado "Toño Bicicleta".

La prueba presentada es conflictiva. El demandante declaró que oyó una voz que le dijo "párate Toño Bicicleta" y que inmediatamente sintió los disparos. Allí mismo cayó herido. Manuel Torres, el policía que hirió al demandante, declaró que al ellos ordenar a éste detenerse el demandante se enfrentó, portando un machete, a otro guardia de apellido Sepúlveda. Con esa declaración aparentemente se propuso justificar los tiros.

Según las declaraciones juradas de los agentes, prestadas en la investigación policíaca llevada a cabo a raíz de los hechos, aquéllos expresaron que se habían escondido, separados a una distancia de cincuenta pies y que ambos le dispararon. El demandante negó que en algún momento hubiese hecho frente o atacado a la policía.

El tribunal de instancia concluyó que se trataba de un accidente desgraciado y que no medió culpa en el mismo, conclusión que no puede racionalmente deducirse de la prueba y que debemos revocar.

Los hechos demuestran que los agentes actuaron en forma impensada, imprudente y que se trata de un caso de crasa y peligrosa negligencia, ya sea ésta debida a falta de entrenamiento profesional de los agentes concernidos o a torpeza de su parte. De la prueba presentada la conclusión a que puede llegarse es que dichos policías, poco entrenados o nerviosos, creyeron ver con la oscuridad al fugitivo que buscaban. Le gritaron que se detuviese y le abrieron fuego.

Hay que tener en mente que desde el punto de vista del demandante tampoco hubiese sido prudente de su parte detenerse pues iba solo, eran cerca de las 11:00 de la noche, el paraje estaba oscuro, y los que le gritaron no estaban identificados como policías. Dentro de las probabilidades actuales bien pudo haber él pensado que se trataba de un atraco.

De todas maneras, hubiese pensado eso o no, no se justificaba hacerle fuego por la espalda a un ciudadano que transitaba pacíficamente por un camino público y sin que

hubiese cometido delito alguno. Ni siquiera puede considerarse que hizo caso omiso de la orden de la policía pues ésta estaba vestida de civil y no se identificó. El demandante no tenía manera de saber si eran policías o no, en caso de que los hubiese visto. Como señaláramos antes, lo que él declaró es que oyó una voz.

Ambos errores señalados se cometieron. (1) En este caso el Estado no está protegido por la inmunidad que reclama en virtud de la Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. sec. 3077 y ss.)(¹) y (2) el tribunal erró al concluir que se trataba de un accidente desgraciado.

En primer lugar, en casos parecidos en que ha mediado negligencia de parte de funcionarios hemos resuelto que el Estado no está inmune. *Meléndez* v. *E.L.A.*, 81 D.P.R. 824 (1960); *Hernández* v. *Fonseca*, 96 D.P.R. 715 (1968); *Montes* v. *Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963); y *Rivera* v. *Trinidad*, 100 D.P.R. 776 (1972).

En segundo lugar, a estas alturas en el desarrollo del Derecho y de la responsabilidad civil del Estado, éste, quien tiene ante la ley, por buenas razones, el monopolio de la violencia, no puede en un caso como el presente de tan palpable y grave negligencia ampararse en el ya anacrónico concepto de inmunidad estatal. Es de todos conocido que nuestro derecho de daños, como parte que es del Código Civil, tiene sus raíces en el Derecho Civil europeo continental. Fue como consecuencia de la invasión de 1898 que se insertaron en nuestro derecho legislativa y jurisprudencialmente doctrinas foráneas provenientes del derecho común anglosajón. Esa práctica ha sido histórica y consistentemente criticada.(²)

---

(¹) Prescribe, en lo pertinente, el Art. 6 de la citada ley que nada de lo allí dispuesto autoriza acciones de daños y perjuicios contra el Estado por acto u omisión de un funcionario, agente o empleado constitutivo de acometimiento, agresión u otro delito contra la persona. 32 L.P.R.A. sec. 3081.

(²) Luis Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico*—Libro I (1947); Del mismo autor, *Compendio de Legislación Puerto-rriqueña y sus Precedentes* (1948); Manuel Rodríguez Ramos, *Por la Reformulación del Derecho Puertorriqueño*, 18 Rev. Jur. U.P.R. 22 (1948-49); Del mismo autor, *Breve Historia de los Códigos de Puerto Rico*, 19 Rev. Jur. U.P.R. 233 (1949-50); Luis

Recientemente, en *Valle* v. *Amer. Inter. Ins. Co.*, 108 D.P.R. 692 (1979), revocamos, en todo lo que entraña la utilización de preceptos del derecho común (angloamericano) para resolver problemas del derecho civil, los casos de *Esbrí* v. *Sucn. Serrallés*, 1 D.P.R. 321 (1902); *Marimón* v. *Pelegrí*, 1 D.P.R. 225 (1902); *Bravo* v. *Franco*, 1 D.P.R. 242 (1902); y *Chevremont* v. *Pueblo*, 1 D.P.R. 431 (1903). Esos casos constituían notorios ejemplos de la desorientada y desorientadora práctica antes mencionada.

Alberto Sánchez, *La Enseñanza del Derecho*, 20 Rev. Jur. U.P.R. 239 (1950–51); Joseph Dainow, *The Method of Legal Development Through Judicial Interpretation in Lousiana and Puerto Rico*, 22 Rev. Jur. U.P.R. 108 (1952–53); Alfonso García Martínez, *Idioma y Derecho en Puerto Rico*, 20 Rev. C. Abo. P.R. 183 (1960); José Trías Monge, *Derecho y Justicia en Puerto Rico*, 25 Rev. C. Abo. P.R. 417 (1964–65); Miró Cardona, *El Sistema Penal de Puerto Rico*, 35 Rev. Jur. U.P.R. 375, 381 (1966): *Se incurre en evidente error al importar instituciones jurídicas por perfectas que se consideren éstas en su país de origen;* Luis M. Ribo, *Observaciones sobre la Jurisprudencia en la Enseñanza del Derecho*, 20 Revista de Derecho Puertorriqueño 335 (1966); F. V. Smith, *The Preservation of Civilian Tradition in "Mixed Jurisdiction"*, 35 Rev. Jur. U.P.R. 263 (1966); Alfonso L. García Martínez, *Forma de las Leyes*, 26 Rev. C. Abo. P.R. 202 (1966); Díaz Asencio, *La Teoría de la Parte Realmente Interesada en la Jurisdicción Puertorriqueña*, 36 Rev. Jur. U.P.R. 87 (1967); Clara López Baralt, *Español: Idioma del Proceso Judicial*, 36 Rev. Jur. U.P.R. 393 (1967); Eduardo Vázquez Bote, *Un Caso Ejemplar de los Problemas del Derecho en Puerto Rico*, 38 Revista de Derecho Puertorriqueño 257 (1970); Carmelo Delgado Cintrón, *Historia del Derecho Puertorriqueño*, 31 Rev. C. Abo. P.R. 157 y 283 (1970); Manuel Rodríguez Ramos, *La Equidad en el Derecho Civil (Estudio de Derecho Comparado)*, 33 Rev. C. Abo. P.R. 5 (1972); José Trías Monge, *Consideraciones sobre Nuestra Justicia*, 33 Rev. C. Abo. P.R. 57 (1972); Carmelo Delgado Cintrón, *Las Escuelas de Derecho de Puerto Rico, 1790–1961*, 41 Rev. Jur. U.P.R. 7 (1972); Alfonso García Martínez, *El Idioma y la Profesión Legal*, 34 Rev. C. Abo. P.R. 473 (1973); José Trías Monge, *Fallas de Nuestro Sistema de Justicia*, 35 Rev. C. Abo. P.R. 379 (1974); José Trías Monge, *Las Escuelas y Estudiantes de Derecho y la Reforma Judicial*, 9 Rev. Jur. U.I.A. 143 (1974); Eulalio A. Torres, *The Puerto Rico Penal Code of 1902–1975: A Case Study of American Legal Imperialism*, 45 Rev. Jur. U.P.R. 1, 3–4 (1976); Raúl Serrano Geyls, *Los Códigos de Familia de Costa Rica y Cuba*, 45 Rev. Jur. U.P.R. 84 (1976); Carmelo Delgado Cintrón, *La Transculturación del Pensamiento Jurídico de Puerto Rico*, 45 Rev. Jur. U.P.R. 305 (1976); Marco A. Rigau, *La Formación del Abogado y Nuestro Derecho—Etica, Técnica, Idioma*, 45 Rev. Jur. U.P.R. 11 (1976); y en 38 Rev. C. Abo. P.R. 1 (1977); José Trías Monge, *La Enseñanza del Derecho y la Formación de un Derecho Propio*, 11 Rev. Jur. U.I.A. 771 (1977); José Ramón Vélez Torres, *La Presencia de los Sistemas de Derecho Civil y de Derecho Anglosajón en la Jurisprudencia Puertorriqueña*, 11 Rev. Jur. U.I.A. 805 (1977); José Trías Monge, *El Derecho de Puerto Rico*, 12 Rev. Jur. U.I.A. 7 (1977); Germán de Granda, *Transculturación e Interferencia Lingüística en el Puerto Rico Contemporáneo*, 1898–1968 (1968).

Es al amplio cauce y a la generosa corriente matriz del Derecho Civil—que es la corriente natural y propia para el crecimiento de nuestro derecho—a la que debemos volver. Especialmente es esto cierto tratándose, como aquí se trata, de materias como la de daños y perjuicios, la cual tiene sus orígenes en dicho derecho.

En *Valle* v. *Amer. Inter. Ins.* supra, dijimos que "el derecho de daños en Puerto Rico se rige, tanto en su forma como en su contenido, por el sistema del derecho civil. . . ." Desde luego eso no impide cultivar el derecho comparado. Los confines de toda disciplina intelectual son prácticamente ilimitados, pero el estudioso u observador de esa riqueza teórica debe poseer, y procurar no perder, el sentido de su propia identidad y de su rumbo. Sólo de esa manera es que el conocimiento de lo extraño en vez de aturdirlo y des-personificarlo le aprovecha y lo enriquece intelectual y espiritualmente.

La doctrina de que el Estado es civilmente responsable es la doctrina histórica y presente del derecho civil. La doctrina llamada inmunidad del soberano resultó de un desarrollo anómalo que, como veremos, no está firmemente basado sobre sus supuestos originales históricos. Consideremos primero la doctrina de la responsabilidad civil del Estado.

Ya en el *Digesto del Corpus Juris Civilis* puede leerse lo siguiente: "Lo mismo que el pretor concedió acción en nombre de los miembros de un municipio, entiendo que también debe concederla contra ellos. Creo que debe concederse acción contra el municipio. . . ." D. 3, 4, 7.

Los que sostenían la irresponsabilidad civil de las ciudades en el antiguo derecho romano no se basaban en principio alguno de inmunidad del soberano, sino en la doctrina de la ficción corporativa, la que sostenía que las corporaciones no eran capaces de cometer daños ya que no podían pensar ni tenían voluntad propia. Duff, *Personality in Roman Private Law* (1971), pág. 227.

Ya en la España medieval, en el *Fuero Juzgo* aparece lo siguiente: "Doncas faciendo derecho el Rey, debe aver nomne de Rey, et faciendo torto, pierde nomne de Rey. Onde los antiguos dicen tal proverbio: Rey serás si decieras derecho, et si non facieras derecho, non serás Rey."

En el *Fuero de Sobranbe*, se expresa: "Para que nuestras leyes y nuestras libertades no padezcan detrimento alguno, habrá cierto juez medio, el cual reparará los perjuicios que el Rey irrogase a cualquiera de sus súbditos y los daños que ocasionare al estado."(³)

En el Siglo XIII, en el *Fuero Real* se preceptúa: "[M]as bien mandamos que si alguna demanda contra el Rey, pide merced en su poridad que gelo enderesce, é si no gelo quisiere el Rey enmendar, digagelo ante dos homes de su Corte, é si por esto no lo quisiera enmendar, puede gelo demandar público, así como pertenece á Pleyto, é como es derecho; ca en tal manera queremos guardar la honra del Rey, é que no tolgamos a ninguno su derecho."(⁴)

El Código Penal español de 1870, en sus Arts. 7 y 9, imponía responsabilidad civil al Estado y a las poblaciones por daños causados a propiedad ajena cuando dichos daños hubiesen sido ocasionados para su beneficio.

Sin embargo, al aprobarse el Código Civil español en 1889, el Art. 1903 del mismo limitó la responsabilidad del Estado a casos en que éste actuase por mediación de un agente especial. Es conocida la incertidumbre y la dificultad que esa expresión de agente especial causó en el derecho de daños. Esa limitación insertada en el Art. 1903 no aparecía en el proyecto del Código Civil del año 1851, que sirvió de base para el Código del 1889, ni aparecía en la Ley Cuarta del Título 13 ni en la Ley Quinta del Título 15 de la Partida Séptima, las que constituyeron los precedentes del Art. 1903 del Código de 1889. Como se sabe, dicho Art. 1903 es el precedente directo

---

(³) J. Irizarry, y Puente, *The Responsibility of the State as a "Juristic Person" in Latin America*, 18 Tul. L. Rev. 408, 410 (1943–44).

(⁴) J. Irizarry y Puente, *Ibid.*

del 1803 del nuestro. 31 Scaevola, *Código Civil* (1974), pág. 558.

Cuarenta y dos años más tarde, desde la vigencia del citado Art. 1903, la Constitución española de 1931 dispuso en su Art. 41 lo siguiente: "Si el funcionario público en el ejercicio de su cargo, infringe sus deberes con perjuicio de tercero, el Estado o la Corporación a quien sirva, subsidiariamente serán responsables de los daños y perjuicios consiguientes conforme determine la ley." Diego Sevilla Andrés, *Constituciones y otras Leyes y Proyectos Políticos de España*, T. II (1969), pág. 226.

Los años 1954–1957 fueron fructíferos en la producción de legislación española relacionada con la responsabilidad civil del Estado. La Ley de Expropiación Forzosa de 16 de diciembre de 1954 generalizó la obligación de la Administración de indemnizar daños ocasionados como consecuencia de medidas adoptadas en supuestos de emergencia, así como los que fueren consecuencia del funcionamiento de los servicios públicos o de la adopción de medidas no fiscalizables por vía contenciosa. Las reclamaciones se verían ante tribunales de jurisdicción contencioso-administrativa. Dicha ley en su Exposición de Motivos expresa que la misma pone remedio a la deficiencia de la ausencia de una pauta legal para hacer efectiva la responsabilidad por daños causados por la administración. Expresa también dicha Exposición de Motivos que la actividad administrativa conlleva una inevitable secuela accidental de daños y una constante creación de riesgos para los patrimonios particulares, creando injusticias amparadas en un injustificado privilegio de exoneración.

En 1957 se aprobó en España la Ley de Régimen Jurídico de la Administración del Estado. Señala Bonet Ramón que no obstante el gran avance efectuado mediante la citada Ley de Expropiación Forzosa de 1954, pareció oportuno consignar la responsabilidad de la Administración en términos más amplios, a fin de cubrir todos los riesgos que para los particulares pueda entrañar la actividad del Estado. Bonet

Ramón, *Código Civil Comentado* (1962), pág. 1507. Veáse también Scaevola, *op. cit.,* págs. 570-576.

La vigente Constitución española, aprobada en 1978, dispone en el inciso 3 de su Art. 9 que la Constitución garantiza "la responsabilidad y la interdicción de la arbitrariedad de los poderes públicos", elevando así a rango constitucional la responsabilidad civil del Estado.

Puede observarse que bajo el sistema del derecho civil español la responsabilidad del Estado por daños fue y es la norma prevaleciente y que fue corto el período de la historia española en que por excepción prevaleció la norma de la inmunidad del Estado.

En Francia, en donde también prevalece la norma de la responsabilidad civil del Estado, dicha norma no fue de origen legislativo como ocurrió en España, sino que fue el producto jurisprudencial del prestigioso Consejo del Estado. En aquel país imperó la doctrina de la inmunidad durante la monarquía pero dicha doctrina cedió ante el influjo de la revolución. Schwartz, *French Administrative Law and the Common-Law World* (1954), págs. 23-42.

En los países de Hispanoamérica, siguiendo la tradición jurídica del derecho civil europeo, prevalece, en términos generales, la norma de la responsabilidad civil del Estado. J. Irizarry y Puente, *The Responsibility of the State as a "Juristic Person" in Latin America,* 18 Tul. L. Rev. 408.

El Código Civil de Rusia, en su Art. 446, también dispone para la responsabilidad del Estado al igual que cualquier otra persona jurídica y en su Art. 454 prescribe la responsabilidad absoluta por actividades peligrosas. 31 Scaevola, *op. cit.,* págs. 230-233.

## II

Veamos brevemente ahora el derecho histórico anglosajón sobre el particular. Como dicho derecho, en comparación con el civil, es de relativamente reciente formación, sus antecedentes se encuentran en la Edad Media.

En el sistema feudal inglés el pequeño señor (*petty lord*) podía tener en sus dominios sus propios jueces para resolver disputas entre sus vasallos. Los vasallos debían someterse a esos jueces pero no el pequeño señor. Éste, a su vez, debía someterse a los tribunales de su superior, el señor feudal (*lord*). De la misma forma que el pequeño señor no quedaba sometido a sus propios jueces, el señor feudal no estaba sometido a sus propios tribunales, pero sí quedaba sometido al Rey, quien estaba a la cabeza de sistema feudal. No existía un tribunal superior al del Rey, de manera que éste podía ser demandado solamente en sus propios tribunales cuando así lo consintiese. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1 (1972); Holdsworth, *A History of English Law*, 5ta ed. (1966), Vol. III, págs. 463–469 y Vol. IX, pág. 8; Plucknett, *A Concise History of the Common Law*, 5ta ed. (1956), págs. 506–520; Radin, *Anglo-American Legal History* (1936).

Se reputaba que el Rey no podía ser demandado en sus propios tribunales no porque él estuviese sobre la ley, ni porque él no fuese capaz de causar daños, sino porque se consideraba un contrasentido que el Rey emitiese e hiciese cumplir una orden o una sentencia contra sí mismo. De manera que realmente no se sostenía que el Rey no podía causar daños, sino que el Rey no debía causarlos, ni tenía el derecho de hacerlo. La frase popular *The King can do no wrong* no era cierta como cuestión de realidad, ni tampoco expresa con exactitud el derecho histórico sobre el particular. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 3 (1963–64); Engdahl, *ibid.*, pág. 3. Como se sabe en la Europa medieval la teoría política prevaleciente era la del constitucionalismo. Fue posteriormente, con el advenimiento de las naciones-estados que surgieron los gobiernos absolutistas los cuales a su vez dieron origen a las revoluciones inglesa y francesa, gobiernos que (los absolutistas) volvieron a resurgir a principios del Siglo XX en sus formas marxista, fascista y nazi. Sabine, *History of*

*Political Theory*, 3ra ed. (1961); McIlwain, *The Growth of Political Thought in the West* (1932); del mismo autor, *Constitutionalism Ancient and Modern*, ed. rev. (1947), y Touchard, *Historia de las Ideas Políticas*, Ed. Tecnos (1977).

Como se reconocía que el Rey era capaz de causar daños pero como no existía un tribunal con jurisdicción sobre él, se desarrolló un mecanismo para vencer ese obstáculo y poder hacer justicia. Ya para fines del Siglo XIII existía la práctica de presentar al Rey peticiones para que éste autorizase la indemnización de daños causados por él o por su gobierno. Engdahl, en el artículo citado, pág. 3, escolio 8, cita el siguiente pasaje:

"Petition is al the remedy the subject hath when the king seiseth his land or taketh away his goods from him havinge no title by ordre of his lawes so to do... And therefore is his peticion called a peticion of right, because of the right the subject hath against the king by the ordre of his lawes to the thing he sueth for."

Como señalamos antes, fue con el decaimiento del feudalismo y con el advenimiento del absolutismo que el Rey vino a identificarse con el Estado y se tergiversó la doctrina original para sostener entonces que el Rey no podía causar daños. Teoría esta última irreal, injusta y absolutista. Harper & James, 2 *The Law of Torts* (1956), pág. 1609; Engdahl, *ibid.*, pág. 4.

En el 1860 un estatuto concedió jurisdicción a los tribunales ordinarios para entender en peticiones de derecho contra la Corona. Wade, *Liability in Tort of the Central Government of the United Kingdom*, 29 N.Y.U.L. Rev. 1416 (1954); Jaffe, *ibid.*, pág. 8. En el 1947 un nuevo estatuto sustituyó la llamada "petición de derecho" y proveyó para una acción ordinaria contra la Corona por actos torticeros. La persona real se mantiene inmune pero no su gobierno. Wade, artículo antes citado.

En los Estados Unidos se adoptó la antigua teoría de la inmunidad real pero como la nueva nación no era una monarquía se le adjudicó dicha inmunidad al gobierno.

Cuando en *Chisholm* v. *Georgia*, 2 U.S. (2 Dallas) 419 (1793), se resolvió que los estados podían ser demandados sin su consentimiento la reacción del Congreso fue la aprobación de la Enmienda XI a la Constitución, mediante la cual se dispuso que el poder judicial federal no se extiende a acciones contra los estados. Dicha enmienda fue el producto del temor que tenían los estados de que los tribunales federales fuesen el vehículo para acciones contra ellos por deudas contraídas durante la revolución. En protección de ese interés estatal los tribunales de los estados habían aceptado, sin mayor discusión, la teoría de la inmunidad. Véase *Petty* v. *Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 276, n. 1. (1959).

En *The Siren* v. *United States*, 74 U.S. 152 (1868), el Tribunal Supremo de los Estados Unidos extendió la doctrina de inmunidad al gobierno federal. Sin embargo, el Congreso ha ido reduciendo progresivamente el ámbito de dicha inmunidad federal. En 1855 el Congreso creó el Tribunal de Reclamaciones y en el 1887 amplió esa legislación. 10 Statutes 612; 24 Statutes 505. En el 1946 se aprobó la *Federal Tort Claims Act*, 60 Stat. 843, que sirvió de modelo para nuestra Ley de Reclamaciones y Demandas contra el Estado, de la cual nos ocupamos más adelante.

Hasta mediados de la década del '50 la regla general en los estados que componen la Unión era la de la inmunidad. La legislación más avanzada para esa época era la del Estado de Nueva York, la cual proveyó para la responsabilidad civil del Estado por daños. Véase Robert A. Leflar & Benjamin E. Kantrowitz, *Tort Liability of the States*, 29 N.Y.U.L. Rev. 1363. Véase el siguiente texto de la Ley de Nueva York:

"The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations, provided the claimant complies with the limitations of this article. Nothing herein contained shall be construed to affect, alter or repeal any provision of the workmen's compensation law." *The Consolidated Laws of New York Annotated*, Book 29 A, Sec. 8.

A partir del año 1957 comenzó un movimiento judicial que en pocos años habría de minar la doctrina de inmunidad del Estado. En los doce años siguientes diecisiete estados y el Distrito de Columbia repudiaron total o parcialmente dicha doctrina. Los tribunales razonaron que la misma resultaba ya anacrónica, que carecía de base racional y que era errónea e injusta. Davis, *Administrative Law Treatise*, Suplemento 1970, págs. 823–870 y Harper & James, *op. cit.*, Suplemento 1969, Vol. 2, pág. 277 y ss.

No dudamos que ese cambio se debió en gran medida a la labor precursora de algunos jueces y juristas en los Estados Unidos que proponían que se descartase la vieja teoría de la inmunidad. Véanse las opiniones disidentes del Juez Frankfurter—*Snyder* v. *Buck*, 340 U.S. 15, 29 (1950); *Kennecot Copper Corp.* v. *State Tax Comm'n*, 327 U.S. 573, 580 (1946); *Great Northern Life Ins. Co.* v. *Read*, 322 U.S. 47, 59 (1944) y su opinión mayoritaria en *Keifer & Keifer* v. *Reconstruction Finance Corp.*, 306 U.S. 381, 391 (1939). Véanse, también, Davis, *op. cit.*, págs. 823–870 del Suplemento de 1970; Schwartz, *op. cit.*, págs. 23–42 y 266–305; Jaffe, *op. cit.* y *Suits Against Governments and Officers: Damages Actions*, 77 Harv. L. Rev. 209 (1963–64); Prosser, *op. cit.*, pág. 970 y ss; Harper & James, *op. cit.*, pág. 277 y ss. del Suplemento de 1969 al Vol. 2.

La experiencia europea también influyó en el cambio antes mencionado que tuvo lugar en el derecho de los Estados Unidos sobre este asunto. En adición a los materiales ya citados, puede verse Richard W. Power, *New Wealth and New Harms—The Case for Broadened Governmental Liability*, 23 Rutgers L. Rev. 449 (1968–69); Walter Gellhorn & Louis Lauer, *Federal Liability for Personal and Property Damage*, 29 N.Y.U.L. Rev. 1325 (1954); Anthony J. Portilio, *Krause v. State: Is Ohio Sovereign Immunity Unconstitutional?*, 33 U. Pitt. L. Rev. 611 (1972); James B. Wilkens, *Sovereign Immunity Abrogated in Ohio: Krause v. State*, 21 Clev. St. L. Rev. 25 (1972); *The Colorado Governmental Immunity Act: A*

*Judicial Challenge and the Legislative Response*, 43 U. Colo. L. Rev. 449 (1971–72); Greenhill & Musto, *Governmental Immunity*, 49 Texas L. Rev. 462 (1970–71); Richard A. O'Del, *Governmental Immunity from Tort Liability: Has the Rationale Disappeared?*, 39 U.M.Kc.L. Rev. 252 (1970–71); Borrel Maciá, *Responsabilidades Derivadas de la Culpa Extra-contractual Civil* (1941), pág. 132 y ss.; Schwartz, *Public Tort Liability in France*, 29 N.Y.U.L. Rev. 14 (1954); Carlota Capó, *En Torno a la Responsabilidad Civil Extracontractual del Estado*, 25 Rev. Jur. U.P.R. 121 (1955–56); Herbert Greenstone, *Liability of Police Officers for Misuse of their Weapons*, 16 Clev.-Mar. L. Rev. 397 (1967); Carol F. Dakin, *Municipal Immunity in Police Torts*, 16 Clev.-Mar. L. Rev. 448 (1967); William C. Mathes & Robert Jones, *Toward a "Scope of Official Duty" Immunity for Police Officers in Damage Actions*, 53 Geo. L. J. 889 (1964–65); Cheney C. Joseph, *Tort Liability of Law Enforcement Officers: State Remedies*, 29 La. L. Rev. 130 (1968).

## III

Hemos examinado brevemente la norma de la responsabilidad civil del Estado en el derecho civil y también en el derecho común anglosajón. Veamos también brevemente la trayectoria de esa norma en Puerto Rico.

En el Título Quinto del Libro II de la *Recopilación de Leyes de los Reynos de las Indias*, ed. 1681, Reproducción 1973, Tomo 1, aparecen disposiciones indicativas de que el fisco podía ser demandado. Véase en particular la Ley VI del Título Quinto del año 1636.

La ley española de 15 de marzo del 1895, la cual establece las bases para el régimen de gobierno de Cuba y Puerto Rico, proveía para responsabilidad civil pública en determinadas circunstancias. Fraga, *Las Constituciones de Puerto Rico* (1953), págs. 140, 144, 150 y 153.

En el 1897 se hizo extensivo a los españoles residentes en las Antillas el Título 1 de la Constitución Española de 1876, el

cual proveía para la responsabilidad civil del Estado en ciertos casos. Fraga, *op. cit.*, págs. 121-125, 223-224.

En la Carta Autonómica obtenida por Puerto Rico de España en 1897, en sus Arts. 58, 63 y 64 se proveía para reclamaciones contra los municipios y las Diputaciones Provinciales cuando se violasen los derechos de las personas. Véase Carta Autonómica, artículos citados y Fraga, *op. cit.*, págs. 252-253.

El asunto de la responsabilidad civil del Estado se planteó en el Tribunal Supremo de Puerto Rico ya bajo el régimen norteamericano y fue resuelto en *Rosaly* v. *El Pueblo*, 16 D.P.R. 508 (1910), caso que envolvía una acción reivindicatoria contra el Estado. El tribunal resolvió correctamente dentro de la tradición civilista y resolvió que procedía la demanda. El Juez MacLeary disintió, basándose en la teoría anglosajona de la inmunidad estatal. La decisión fue apelada por El Pueblo y el Tribunal Supremo de los Estados Unidos, de aquella época, estuvo de acuerdo con la posición del Juez MacLeary. *Porto Rico* v. *Rosaly y Castillo*, 227 U.S. 270 (1913).

En vista de la posición del alto Tribunal federal, el nuestro dio marcha atrás. *Aponte* v. *Freiría*, 20 D.P.R. 93 (1914). Desde luego, aquélla era la época pre-Estado Libre Asociado. Estimamos que a estas alturas en el desarrollo del derecho y bajo las presentes circunstancias (E.L.A.) la decisión sería diferente. Creemos que sería diferente, además, debido a las doctrinas de "error manifiesto" y "error inescapable" elaboradas, con encomiable sentido de justicia y de política pública, por el Tribunal Supremo de los Estados Unidos en ocasiones posteriores al citado caso de *Porto Rico* v. *Rosaly.* Véanse, por ejemplo, *De Villanueva* v. *Villanueva*, 239 U.S. 293, 299 (1915); *Nadal* v. *May*, 233 U.S. 447, 454 (1914), y *Benítez* v. *González y Lugo*, 261 U.S. 102, 105-106 (1923), en donde el Tribunal Supremo de los Estados Unidos dijo:

"This court has stated many times the deference due to the understanding of the local courts upon matters of purely local

concern .... This is especially true in dealing with the decisions of a court inheriting and brought up in a different system from that which prevails here .... Our appellate jurisdiction is not given for the purpose of remodeling the Spanish-American law according to common law conceptions except so far as that law has to bend to the expressed will of the United States."

En el mismo sentido en *Bonet* v. *Yabucoa Sugar Co.*, 306 U.S. 505, 509–510 (1939), el Tribunal insistió:

"... this Court has declared its unwillingness to overrule Puerto Rican tribunals upon matters of purely local concern or to decide against the local understanding of a local matter, not believed by this Court to be clearly wrong; and a disposition to accept the construction placed by a local court upon a local statute and to sustain such a construction in the absence of clear or manifest error ....

"... Orderly development of the government of Puerto Rico as an integral part of our governmental system is well served by a careful and consistent adherence to the legislative and judicial policy of deferring to the local procedure and tribunals of the Island."

Dijo el Tribunal Supremo de los Estados Unidos: "For to justify reversal in such cases, the error must be clear or manifest; the interpretation must be inescapably wrong; the decision must be patently erroneous." *Bonet* v. *Texas Co.*, 308 U.S. 463, 470–471 (1940). Véase, también, *De Castro* v. *Board of Commissioners*, 322 U.S. 451 (1944).

En 13 de abril de 1916 se aprobó en Puerto Rico la Ley Núm. 76 autorizando demandas contra El Pueblo por daños basados en contratos y en acciones reivindicatorias. Doce años más tarde, se aprobó la Ley Núm. 11 de 18 de abril de 1928, enmendatoria de la Ley del 1916, permitiendo expresamente contra El Pueblo acciones por daños y perjuicios. La jurisprudencia local restrictiva tuvo el efecto de hacer al Estado prácticamente inmune de demandas por daños. Esa posición judicial obligó a las personas perjudicadas por acción gubernamental a solicitar de la Asamblea Legislativa que mediante leyes particulares autorizara en cada caso la demanda contra el Estado. Comenzando con la década del

1950 la Administración adoptó la política de no denegar ninguna de esas medidas legislativas solicitadas y se aprobó un considerable número de dichas leyes especiales. Así, autorizadas las demandas en cuestión, el caso pasaba a la Rama Judicial para su adjudicación. En otras palabras, la entonces conservadora actitud judicial fue atemperada por la liberalidad legislativa. Siendo este asunto uno de naturaleza judicial la solución que aquí proponemos—que el mismo sea únicamente de la incumbencia de los tribunales—nos parece la más indicada, amén de que es la correcta dentro de nuestro derecho civil, según hemos expresado antes.

En 29 de junio de 1955 se aprobó la Ley Núm. 104, la cual estaba "inspirada en el deseo de que el Estado pueda ser demandado cuando cualquier ciudadano entienda que tiene una buena y justa causa de acción y que sea el poder judicial el que determine la validez y suficiencias [sic] que se formulan contra el Estado". Informe de la Comisión de lo Jurídico de la Cámara de Representantes, 4 *Diario de Sesiones* 1989.

Sin embargo, el proyecto de ley original sufrió una serie de enmiendas antes de convertirse en la Ley Núm. 104. La limitación más importante que sufrió fue aquella que dispuso en su Art. 6 que la misma no autorizaba demandas por daños por actos u omisiones de determinados funcionarios en determinadas circunstancias. El Informe de la Comisión no revela los motivos que justificaron esas enmiendas. Parece que lo que hizo fue tomarlas del *Federal Tort Claims Act* del año 1946. Era de esperarse que la ley federal tuviese esas limitaciones porque, como hemos señalado, la teoría anglosajona que permea esta materia es distinta a la nuestra, que es la del derecho civil. No era de esperarse, sin embargo, que se copiasen tales limitaciones. Sin embargo, la ley federal exime solamente si el funcionario o empleado ejerció debido cuidado al actuar, de manera que bajo dicha ley el gobierno responde si esos empleados o funcionarios actúan negligentemente en la ejecución de una ley o de un reglamento.

Para no hacer esta opinión innecesariamente extensa no vamos a discutir individualmente los muchos casos que han surgido sobre este asunto de la responsabilidad civil del Estado, pero vamos a consignar un número de ellos más adelante en un escolio. Del examen de dichos casos llegamos a la conclusión de que sintiéndose el Tribunal obligado por una teoría (la de la inmunidad estatal) injusta, moralmente insostenible y carente de base racional—teoría que no se había decidido a revocar—pero con el deseo de hacer justicia, el Tribunal ha fallado de manera no uniforme con el resultado de que su jurisprudencia sobre el particular parece errática.(⁵)

Por ejemplo, carece de base racional la distinción hecha en algunos casos entre la situación cuando un policía manipula negligentemente un revólver causando daños sin intención de disparar y la situación de cuando el policía causa daños al manejar el revólver negligentemente pero habiendo tenido la intención de disparar y al hacerlo hiere a una persona inocente. A los efectos de la persona perjudicada nada tiene que ver si al ser ésta herida debido a la negligencia del agente público, éste tuvo o no la intención de disparar. La base de la responsabilidad no es la intención de disparar; lo es la falta del debido cuidado.

Por el contrario, para decisiones justicieras véanse *Meléndez* v. *E.L.A.*, 81 D.P.R. 824 (1960); *Hernández* v.

---

(⁵) *Rosaly* v. *El Pueblo*, 16 D.P.R. 508 (1910); *Aponte* v. *Freiría*, 20 D.P.R. 93 (1914); *Ortiz* v. *Pueblo*, 44 D.P.R. 153 (1932); *M. Grau e Hijos* v. *Pueblo*, 51 D.P.R. 13 (1937); *Pérez* v. *Pueblo*, 54 D.P.R. 34 (1938); *Pérez* v. *Pueblo*, 55 D.P.R. 437 (1939); *Soto* v. *Lucchetti*, 58 D.P.R. 713 (1941); *Ortiz Toro* v. *Pueblo*, 59 D.P.R. 441 (1941); *Rivera* v. *Pueblo*, 65 D.P.R. 983 (1946); *Quintero* v. *Servicio de Riego*, 66 D.P.R. 940 (1947); *Peña* v. *Pueblo*, 68 D.P.R. 942 (1948); *Acevedo* v. *Pueblo*, 69 D.P.R. 434 (1948); *Rodríguez* v. *Pueblo*, 75 D.P.R. 401 (1953); *Meléndez* v. *E.L.A.*, 81 D.P.R. 824 (1960); *Jiménez* v. *El Pueblo*, 83 D.P.R. 201 (1961); *Baralt* v. *E.L.A.*, 83 D.P.R. 277 (1961); *Vda. de Valentín* v. *E.L.A.*, 84 D.P.R. 112 (1961); *Dobbins* v. *Hato Rey Psychiatric Hospital*, 87 D.P.R. 30 (1962); *Báez Vega* v. *E.L.A.*, 87 D.P.R. 67 (1963); *Montes* v. *Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963); *Alberio Quiñones* v. *E.L.A.*, 90 D.P.R. 812 (1964); *Rivera Rivera* v. *Trinidad*, 100 D.P.R. 776 (1972); *Piñeiro Manzano* v. *E.L.A.*, 101 D.P.R. 113 (1973); y *Piñeiro Manzano* v. *E.L.A.*, 102 D.P.R. 795 (1974), en reconsideración.

*Fonseca*, 96 D.P.R. 715 (1968); y *Montes* v. *Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963).

En cuanto a la antes mencionada Ley Núm. 104 de 29 de junio de 1955, entre sus Arts. 2, 6 y 10 hay unas contradicciones reales o aparentes. Por ejemplo, el Art. 2 autoriza demandas al Estado por daños, hasta $15,000, causados por cualquier funcionario, agente o empleado suyo actuando en capacidad oficial. También autoriza demandas fundadas en la Constitución o en cualquier ley o reglamento de Puerto Rico o en algún contrato con el Estado.

Por su parte, el Art. 6 de dicha Ley dispone que "nada en esta ley autoriza" las acciones por daños contra el Estado causados por actos u omisiones de un funcionario, agente o empleado (a) en el cumplimiento de una ley o reglamento, (b) en el desempeño de una función de carácter discrecional, aun cuando hubiere abuso de discreción . . . y (d) por actos constitutivos de acometimiento, agresión u otro delito contra la persona . . . etc. Tomado literalmente y con una interpretación amplia ese Art. 6 prácticamente dejaría sin vigencia el Art. 2.[6]

También es de notar que el Art. 10 de dicha Ley enmienda el Art. 1803 del Código Civil. El 1803 expande el 1802. En el 1802 se establece la obligación de reparar los daños causados por culpa o negligencia. El 1803 aclara que se responde no sólo por los actos u omisiones propios, sino por los de aquellas personas de quienes se debe responder.

El párrafo quinto de dicho nuevo Art. 1803 dispone que el Estado es responsable "en este concepto" en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular. Es legítima la duda de si esa aclaración se aplica a todos los párrafos del Art. 1803—menores de edad, pupilos bajo tutores, dependientes de establecimientos o empresas, y aprendices de artes y oficios.

---

[6] Siguiendo la corriente contemporánea de reconocer la responsabilidad del Estado, la ley federal eliminó casi toda la inmunidad estatal que antes prescribía. 88 Statutes 50 (1974).

En ese caso dicho artículo podría venir en conflicto con el antes citado Art. 6 de la Ley Núm. 104. Pero si tratásemos de armonizar en lo posible las distintas disposiciones de la Ley Núm. 104 podríamos entender que dicho párrafo quinto se refiere solamente al párrafo inmediatamente anterior—el caso de los dueños o directores de un establecimiento o empresa. Entonces no surgiría el mencionado conflicto.

De todas maneras, dada la conclusión a que hemos llegado sobre el problema fundamental de este caso y de la propia Ley Núm. 104, esto es, el reconocimiento que aquí hacemos de la responsabilidad civil del Estado y el ser su adjudicación materia propiamente judicial (de lo contrario el Estado sería juez y parte), resulta innecesario y sería académico entrar en una discusión a fondo de dichas contradicciones reales o aparentes y tratar de armonizarlas.

Como señalamos, el Art. 10 de la mencionada Ley Núm. 104 enmendó el Art. 1803 del Código Civil. Por ser el Código un cuerpo armónico en toda su extensión, resulta siempre probable que al enmendar un artículo suyo la enmienda tenga consecuencias en relación con otros artículos del Código, así como el intervenir con una pieza de un reloj muy probablemente va a tener consecuencias en cuanto al funcionamiento de las demás. Al considerar propuestas para enmendar el Código Civil recomendamos que se vean los siguientes dos trabajos: "Génesis y Aportaciones del Nuevo Título Preliminar del Código Civil," por Antonio Hernández Gil, que aparece en el libro *Ciclo de Conferencias Sobre el Nuevo Título Preliminar del Código Civil*, Barcelona (1976), pág. 7 y ss. y "Notas para la Historia de la Reforma del Título Preliminar del Código Civil," por José María Castán Vázquez, que aparece en la revista *Documentación Jurídica*, Ministerio de Justicia, Madrid, Núm. 4 (oct.-dic. 1974), pág. 1139 y ss.

## IV

Porque la llamada doctrina de la inmunidad estatal viola el derecho a la igual protección de las leyes al establecer que

se pueden recobrar daños causados por particulares y no los causados por el Estado; porque esa clasificación carece de base racional, lo cual también la hace inconstitucional, y porque dicha doctrina constituye una iniquidad en violación de uno de los principios generales del derecho—la equidad— principio que permea nuestro ordenamiento jurídico, yo revocaría la sentencia recurrida. En vista de que la opinión del tribunal de instancia se basó en consideraciones de derecho y no hizo conclusiones sobre la cuantía de los daños, devolvería el caso al Tribunal Superior para que éste, a la mayor brevedad posible y previa vista, haga dichas determinaciones y dicte sentencia a tenor con lo aquí expresado y fijando los daños a ser pagados. Dictaría sentencia a esos efectos.

En vista del voto concurrente del distinguido compañero Juez Díaz Cruz y de lo expresado al respecto en la opinión mayoritaria, estimo necesario expresar lo siguiente: (1) Yo no propongo que los daños los paguen los empleados públicos, sino que sea el Estado quien los pague.

(2) Aunque no la comparto, respeto la posición ortodoxa tomada en la opinión mayoritaria. Sin embargo, no creo que tenga mucha validez el argumento de que el recurrente no planteó la cuestión constitucional. Aparte de que este Tribunal está expresamente autorizado por la ley para entrar en planteamientos aunque éstos no fuesen señalados, 4 L.P.R.A. sec. 36, el propio Juez Dávila al escribir la opinión del Tribunal en *Dávila* v. *Valdejully*, 84 D.P.R. 101, 104 (1961), al sostener que el Tribunal puede entrar en planteamientos no señalados expresó "Y es que así debe dispensarse la justicia."

El mismo distinguido Juez en *Pueblo* v. *Serrano Nieves*, 93 D.P.R. 56, 57 (1966), al sostener la misma posición que he señalado, expresa que "es tradición de este Tribunal en el cumplimiento de su misión de impartir justicia" no limitarse a los planteamientos alegados por los litigantes sino que puede entender en todos los hechos, tramitaciones de la causa y en sus méritos "para la mejor administración de justicia y

del derecho . . .". Recientemente reiteramos esa posición por voz del Juez Presidente en *Pueblo* v. *Colón Obregón*, 102 D.P.R. 369, 372 (1974).

En cuanto a otras jurisdicciones, en uno de los casos más importantes de la jurisprudencia de los Estados Unidos, *Erie R. Co.* v. *Tompkins*, 304 U.S. 64 (1938), el Tribunal Supremo de aquel país hizo su trascendental decisión, revocando un siglo de jurisprudencia en sentido contrario, también sin que el planteamiento hubiese sido alegado.

—o—

Voto concurrente en parte del Juez Asociado Señor Díaz Cruz.

Mi reverencia por nuestra tradición civilista latina no me inclina a aceptar sin reserva todos sus ordenamientos. El Art. 42 de la Ley de Régimen Jurídico de la Administración del Estado de 26 julio, 1957 (España) regula con carácter general la responsabilidad del Estado español y renuncia a la inmunidad de éste, "sin perjuicio de que el Estado, previo el oportuno expediente, pueda declarar responsables a las autoridades y funcionarios que por culpa o negligencia hayan lesionado los bienes o derechos de la Administración o los de tercero". Bonet Ramón, *Código Civil Comentado*, 2da ed. (1964), págs. 1507–1508.

Considero más justa la legislación de Puerto Rico que renunciando a la inmunidad del Estado impone un límite conceptual y económico a las reclamaciones bajo el 1803, en vez de recuperar del funcionario o empleado, con posible ruina de su modesto patrimonio, los daños que su negligencia causare, como lo autoriza el estatuto español. En nuestro medio, donde tanto el Estado, como sus funcionarios, como los propios terceros perjudicados en general son parcos en recursos, debemos evadir la solución drástica y optar por un adecuado aumento en los límites de responsabilidad, acción que corresponde a la Asamblea Legislativa. La moderación que representa la limitación de cuantías y la exclusión de

ciertas acciones por el Art. 6 de la Ley Núm. 104 de 29 junio, 1955 (32 L.P.R.A. secs. 3077 y 3081) no contraviene el debido proceso ni niega la igual protección de las leyes. Responde a nuestra circunstancia y realidad vital y al reconocido interés público en proteger tanto al reclamante, como al empleado o funcionario y los recursos del Estado.

La apreciación de la prueba es arbitrio del juzgador quien llegó a la conclusión de que se trata de accidente desgraciado y que no medió culpa de los agentes. Sin embargo, la prueba acusa actuación irreflexiva y negligente de los agentes policías por lo que se justifica, a tenor de la Regla 43.2 (1979), prescindir de las conclusiones de instancia y declarar el caso compensable. En este aspecto exclusivamente concurro en el resultado a que llega el compañero Juez Rigau.

—O—

Opinión del Juez Asociado Señor Irizarry Yunqué.

He dado mi voto a la opinión del Tribunal por considerar que hace una interpretación liberal de la Ley Núm. 104 de 29 de junio de 1955, 32 L.P.R.A. secs. 3077 a 3084. Mas, habiéndose hecho una expresión concurrente por el compañero Juez Rigau, a la que se une el señor Juez Presidente y, como participo del criterio en ella enunciado de que dicha ley es inconstitucional, me parece conveniente dejar constancia de mi posición, lo que hago mediante el presente escrito.

No empece la norma de abstención que los tribunales nos hemos trazado respecto a la consideración de la validez constitucional de un estatuto cuando ello no se nos ha planteado y cuando el caso puede resolverse por otros fundamentos, *Pacheco* v. *Srio. Instrucción Pública*, 108 D.P.R. 592 (1979); *Mari Bras* v. *Alcaide*, 100 D.P.R. 506, 513 (1972); *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925, 927 (1971); *Suárez Sánchez* v. *Tribunal Superior*, 92 D.P.R. 507, 516 (1965); *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 596 (1958), considero deseable que la profesión en general sepa cómo pensamos sus jueces sobre el particular.

Estoy de acuerdo con el análisis que hace el Juez Rigau sobre el origen y desarrollo de la llamada teoría de "inmunidad del Estado", como fundamento para sostener la invalidez de la ley. No obstante, elaboraría, sobre los conceptos que a continuación expongo.

1. El Estado ejerce aquellos poderes y goza de aquellos derechos que el Pueblo le ha delegado en su Constitución, que es su estatuto orgánico. Aquellos poderes expresamente no delegados al Estado pertenecen al Pueblo. Entre ellos está el derecho de cada ciudadano a reclamarle al Estado por los daños que éste le cause.

Declara explícitamente nuestra Constitución, en su Preámbulo:

"Que el sistema democrático es fundamental para la vida de la comunidad puertorriqueña;

"Que entendemos por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder público, *donde el orden político está subordinado a los derechos del hombre* y donde se asegura la libre participación del ciudadano en las decisiones colectivas." Párrafos tercero y cuarto, Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico. (Énfasis nuestro.)

El Estado no puede estar inmune a los reclamos del Pueblo. Si lo estuviese, sería un contrasentido reclamar que es en el Pueblo donde radica la soberanía; se estarían negando su naturaleza y la fuente de su poder. La Carta de Derechos de nuestra Constitución hace una enumeración de derechos que son otras tantas limitaciones de los poderes delegados al Estado. Finalmente, en su Sec. 19, declara:

"La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo." (Art. II, Sec. 19.)

La Constitución no contiene una cláusula de interpretación liberal con respecto a los poderes del Estado. Por el contrario,

los poderes del Estado han de interpretarse restrictivamente cuando confligen con los derechos del Pueblo. Tal es el mandato constitucional recogido en la transcrita Sec. 19. El Estado no tenía que autorizar, mediante la Ley Núm. 104 que nos ocupa, que se le pueda demandar. El derecho a demandar al Estado está implícito en la soberanía del Pueblo, que no ha sido ni expresa ni implícitamente renunciado.

2. La Ley Núm. 104 viola la cláusula del debido proceso de ley al impedir o limitar el acceso a los tribunales de aquellas personas a quienes el Estado causa daño.

Por analogía, puede considerarse lo resuelto por el Tribunal Supremo federal en *Boddie* v. *Connecticut*, 401 U.S. 371 (1971). Allí se determinó que la aplicación a indigentes de ciertos requisitos de pagos por la presentación de demandas civiles y sus correspondientes emplazamientos violaba el debido proceso de ley garantizado por la Enmienda Catorce de la Constitución federal. El estado de Connecticut exigía el pago de $60.00 por la presentación de una demanda de divorcio, más otra suma por el emplazamiento, cantidades que los apelantes no podían pagar. Dijo el Tribunal Supremo, págs. 382–383:

"We do not decide that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any individual, for, as we have already noted, in the case before us this right is the exclusive precondition to the adjustment of a fundamental human relationship. The requirement that these appellants resort to the judicial process is entirely a state-created matter. Thus we hold only that a State may not, consistent with the obligations imposed on it by the Due Process Clause of the Fourteenth Amendment, pre-empt the right to dissolve this legal relationship without affording all citizens access to the means it has prescribed for doing so." *Boddie* v. *Connecticut*, 401 U.S. 371, 382–383 (1971).

A pesar de semejante lenguaje, se ha señalado la posibilidad de aplicar a *Boddie* a pleitos contra el gobierno. En ambos casos el Estado monopoliza los medios para resolver el

conflicto. Como consecuencia, se violaría el debido proceso de ley si el Estado impusiese cualquier condición que impidiese el acceso a los tribunales de quienes reclaman contra él, a menos que existiese una razón de peso para ello. Véanse *The Supreme Court, 1970 Term*, 85 Harv. L. Rev. 3, 107, nota 18 (1971); Abram, *Access to the Judicial Process,* 6 Georgia L. Rev. 247, 255 (1972).

Si bien el Tribunal Supremo federal ha rehusado extender a *Boddie* más allá de su resultado específico, *United States* v. *Kras*, 409 U.S. 434 (1973); *Ortwein* v. *Schwab*, 410 U.S. 656 (1973), ello no es óbice para que este Tribunal interprete nuestra cláusula constitucional sobre el debido proceso de ley en forma más amplia.

En nuestro sistema de derecho la norma es que aquél que causa daño a otro mediante culpa o negligencia está obligado a reparar el daño causado. 31 L.P.R.A. sec. 5141. Esta responsabilidad se extiende no sólo a los actos propios sino también a los de aquellas personas de quienes se debe responder, y en este concepto el Estado responde "en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular." 31 L.P.R.A. sec. 5142. A la luz de estas disposiciones, el resarcimiento de los daños causados por culpa o negligencia es un valor de extrema importancia.

Cuando una persona sufre daños por los actos culposos o negligentes del Estado, su reclamación cae bajo el exclusivo control de éste. La Ley Núm. 104 de 29 de junio de 1955 impone un requisito de notificación al Secretario de Justicia y prohíbe las acciones por daños y perjuicios causados por ciertas categorías de actuaciones. 32 L.P.R.A. secs. 3077a, 3081. El Estado controla el acceso a los tribunales de quienes han sufrido daño por sus actuaciones, colocando al reclamante en una posición de indefensión. Estos obstáculos carecen de justificación suficiente. Son limitaciones arbitrarias que contravienen toda noción básica de justicia, en violación del debido proceso de ley garantizado por la Constitución del Estado Libre Asociado. Art. II, Sec. 7.

3. La citada Ley Núm. 104 conflige, además, con la cláusula de igual protección de las leyes.

Dicha ley, según su título, tiene el propósito de "autorizar las reclamaciones y demandas contra el Estado". Su historial legislativo apuntala ese propósito. La Comisión de lo Jurídico de la Cámara, al informar sobre el P. de la C. 1145, que se convirtió en la citada Ley Núm. 104, expresó:

"La medida está inspirada en el deseo de que el Estado pueda ser demandado cuando cualquier ciudadano entienda que tiene una buena y justa causa de acción y que sea el poder judicial el que determine la validez y suficiencias [*sic*] que se formulan contra el Estado." *Diario de Sesiones*, Vol. IV, T. III, pág. 1989 (1954).

El Sr. Polanco Abreu, expresándose sobre el proyecto, dijo:

"Esta Cámara ha resuelto definitivamente, a mi juicio, el que sea el Poder Judicial el que determine la suficiencia de todas las demandas que contra el Estado se radiquen. Claramente queda establecido ahí que es el Poder Judicial ante quien se ventila [*sic*], de igual a igual, el ciudadano y el Estado, cualquier demanda que contra él se tenga." *Diario de Sesiones*, Vol. IV, T. III, pág. 1990 (1954).

Sin lugar a dudas, el propósito de la Ley Núm. 104 de 29 de junio de 1955 es facilitar el acceso a los tribunales de las reclamaciones que tengan los ciudadanos contra el Estado incluyendo aquéllas por daños y perjuicios.

La Ley Núm. 104 en su Art. 6 crea unas excepciones a la responsabilidad del Estado, responsabilidad que dicha ley reconoce. Impide las reclamaciones contra el Estado cuando éstas surgen de las actuaciones allí contempladas. 31 L.P.R.A. sec. 3081. Con esas excepciones está creando una distinción entre personas que están en la misma posición. De todas las personas que constituyen el grupo de perjudicados por actuaciones del Estado, distingue aquellas cuyos daños surgen de las actuaciones contempladas en el Art. 6 y les prohíbe hacer reclamación contra el Estado. Establece una clasificación legislativa a todas luces irrazonable. Dijimos en *Zachry*

*International* v. *Tribunal Superior,* 104 D.P.R. 267, 277 (1975):

"El Estado puede hacer clasificaciones entre las personas sin infringir dicho principio siempre y cuando la clasificación sea razonable con miras a la consecución o protección de un interés público legítimo."

El criterio del nexo racional exige que la clasificación cumpla propósitos legítimos y tenga una relación racional con éstos. La "racionalidad" se ha de medir a base de la capacidad de la clasificación para cumplir los propósitos de la legislación. *Zachry International* v. *Tribunal Superior,* supra; *Eisenstadt* v. *Baird,* 405 U.S. 438 (1972); L. Tribe, *American Constitutional Law,* N.Y. The Foundation Press, 1978, sec. 16-2.

Un examen de la clasificación creada por el Art. 6 de la Ley Núm. 104 demuestra que ésta carece de nexo racional con los propósitos de dicha ley. Por un lado, dicho estatuto reconoce el derecho de los ciudadanos a instar reclamaciones contra el Estado ante los tribunales de justicia y, por otro lado, limita ese derecho a determinados ciudadanos a base de qué funcionario o empleado del Estado causa el daño y en función de qué lo causa. Así por ejemplo, si un policía, en el desempeño de sus funciones, se excede y negligentemente causa daño a una persona, el Estado responde. *Alberio Quiñones* v. *E.L.A.,* 90 D.P.R. 812 (1964); *Báez Vega* v. *E.L.A.,* 87 D.P.R. 67 (1963). Pero si puede establecerse una distinción para que la actuación negligente del policía pueda constituir un acto culposo suyo, procesable como uno de los delitos mencionados en dicho Art. 6, el Estado no responde. *Báez Vega,* supra. En otras palabras, se hace depender la responsabilidad del Estado de sutilezas interpretativas a base de las cuales algunas personas tienen derecho y otras no, a reclamar por daños que el Estado les causa. Nada más arbitrario, frente a la cláusula de igual protección.

Para concluir, es de notarse que la llamada inmunidad del Estado contra reclamaciones va en decadencia. Ha sido

abolida como tal, o en su manifestación como inmunidad gubernamental, mediante decisiones judiciales en las siguientes jurisdicciones estatales norteamericanas: Arizona (*Stone* v. *Arizona Highway Commission*, 381 P.2d 107 (1963)); California (*Muskopf* v. *Corning Hospital District*, 359 P.2d 457 (1961)); Colorado (*Colorado Racing Commission* v. *Brush Racing Ass'n*, 316 P.2d 582 (1957); *Evans* v. *Board of County Commissioners of County of El Paso*, 482 P.2d 968 (1971); *Proffitt* v. *State of Colorado*, 482 P.2d 965 (1971)); Indiana (*Campbell* v. *State*, 284 N.E.2d 733 (1972)); Michigan (*Williams* v. *City of Detroit*, 111 N.W.2d 1 (1961)); Nueva Jersey (*Willis* v. *Dept. of Conservation*, 264 A.2d 34 (1970)); Nuevo México (*Hicks* v. *State*, 544 P.2d 1153 (1975)); Pennsylvania (*Ayala* v. *Philadelphia Board of Public Education*, 305 A.2d 877 (1973); *Mayle* v. *Pennsylvania Dept. of Highways*, 388 A.2d 709 (1978)). El Distrito de Columbia también ha abolido la inmunidad gubernamental. (*Spencer* v. *Genereal Hospital of the District of Columbia*, 425 F.2d 479 (1969)). Merece señalarse que la gran mayoría de estos casos tomaron como fundamento para la abolición de la inmunidad del soberano el hecho de que esta doctrina fue creada judicialmente. Como criatura judicial, ésta puede morir judicialmente.